Kent MILLER and Barbara
Miller, Plaintiffs,

v.

UNITED STATES of America,
Defendant.

No. C 04–00511 JSW.

United States District Court,
N.D. California.

Nov. 22, 2004.

Don Paul Badgley, Mark J. Wilson, Badgley Mullins Law Group Seattle, WA, Brian G. Isaacson, Isaacson Law Firm, Seattle, WA, for plaintiffs.

Jay R. Weill, San Francisco, CA, for defendant.

## ORDER DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

WHITE, District Judge.

This matter comes before the Court upon the parties' cross-motions for summary judgment. Having considered the parties' pleadings, the relevant legal authority, and having had the benefit of oral argument, the Court hereby DENIES Plaintiffs' motion for summary judgment and hereby GRANTS Defendant's motion for summary judgment.

### I. PROCEDURAL BACKGROUND

On or about October 10, 2001, Plaintiffs Kent and Barbara Miller ("Plaintiffs")[1] filed their tax return for the 2000 tax year. On or about June 11, 2003, Plaintiffs filed an amended tax return seeking a refund in the amount of $229,387.00, together with allowable interest. On December 18, 2003, Plaintiffs filed an amendment to their

---

1. Barbara Miller is a plaintiff in this action by virtue of having filed a joint tax return with her husband, plaintiff Kent Miller. The Court will refer to the Millers collectively as "Plaintiffs" herein.

amended tax return, seeking a refund in the amount of $221,770, together with allowable interest. The refund claims were denied. Thereafter, Plaintiffs filed their refund suit in this Court.

In their complaint, Plaintiffs advanced—as they had in filing their amended returns—two bases on which they were entitled to a refund. Plaintiffs contended that, pursuant to Treasury Regulation § 1.83–3, they should not have been taxed on the value of the shares at the date of exercise, because "neither the risk of decline in value [nor] the beneficial ownership of the shares were transferred to Plaintiffs . . . ." (Complaint ¶ 13.) In the alternative, Plaintiffs contended that, pursuant to Treasury Regulation § 1.83–1(e)[2], they should be allowed an ordinary loss deduction on the sale of the shares in the year 2000. (Complaint ¶¶ 15–16.)[3]

On July 14, 2004, Plaintiffs' filed their motion for summary judgment. On September 30, 2004, Defendant filed its opposition and cross-motion. The Court heard oral argument on the motions on November 5, 2004.

## II. FACTUAL BACKGROUND

The parties generally agree on the facts. However, they dispute the materiality of those facts on the legal issues in this case.

The parties agree to the following: Plaintiff Kent Miller ("Mr.Miller") was an employee of Microsoft Corporation ("Microsoft") during the tax year 2000. (Declaration of Kent Miller in Support of Motion for Summary Judgment ("K. Miller Decl."), ¶ 2.) As part of his compensation package, Mr. Miller was granted employee stock options to acquire shares in Microsoft. (*Id.* ¶ 3.)

Microsoft's Employee Stock Option Plan permits employees to exercise options through a Broker Assisted Cashless Exercise Program ("Program").[4] (*Id.*) Employees exercising options must pay the strike price and withholding taxes on the date they exercise their options. (*Id.* ¶ 4 n. 2). Pursuant to the Program, employees may pay the strike price and withholding taxes by having a broker deliver the payment to Microsoft. (*Id.* ¶ 3 n. 1, ¶ 4 & n. 2.)

Utilizing the Program, Mr. Miller exercised options for a total of 21,837 Microsoft shares in 2000 through a loan from Paine Webber in the amount of $916,480. (*Id.* ¶ 4). These shares were held in a margin account and were pledged as collateral for the loan. (Motion at 8.) Plaintiffs admit that they "intended to continue to own their Microsoft stock." (Complaint ¶ 10.) However, as the value of the shares declined in 2000, all of the shares were liqui-

**2.** 26 C.F.R. § 1.83–1(e). Hereinafter, references to the Internal Revenue Code are cited as "I.R.C. § ___". References to the Code of Federal Regulations are cited as "Treas. Reg. § ___".

**3.** The parties' arguments on summary judgment were limited to Plaintiffs' right to relief pursuant to Treasury Regulation § 1.83–3. In light of that fact, and in light of the Court's ruling, the Court does not address Plaintiffs' alternative theory for relief.

**4.** At the hearing on this matter, the Defendant stated it had not seen any evidence regarding the existence of a "Broker Cashless Exercise Program." The documents submitted by Plaintiffs, however, demonstrate that Microsoft permitted its employees to exercise options by having a broker deliver funds to Microsoft. (K. Miller Decl. Ex A at KJM 000646.) Other documents submitted by Miller also refer to the concept of "cashless exercise" of options. (*See* Supp. Decl. of Brian Issacson, Ex. A.) Because Defendant does not dispute the method by which Miller exercised his options to purchase his shares, whether or not this method of exercising options has been instituted by Microsoft as a formal program is immaterial to the resolution of this matter. For ease of reference, the Court shall continue to refer to Miller's method of exercising his options as having been done pursuant to the "Program".

dated by Paine Webber "as a consequence of, or in anticipation of, margin calls." (*Id.* ¶ 11; K. Miller Decl. ¶ 7).

The parties agree Mr. Miller would have been able to vote his shares, receive dividends on the shares, or sell the shares before they were liquidated. The parties also agree that Mr. Miller apparently was able to utilize the value of the Microsoft shares to purchase other securities. (*See id.,* Ex. A at KJM000581–641).

Plaintiffs contend that the terms of the agreement required Paine Webber to foreclose on the shares if the loan collateral requirements dropped below the debt balance multiplied by 1.333%. (*Id.* ¶ 6.) Defendant does not dispute the fact that Paine Webber could foreclose on the shares. Plaintiffs conceded in their papers and at the hearing that they would be liable for a deficiency under the terms of the loan agreement with Paine Webber. (Motion at 27.) Plaintiffs contend, however, that due to the structure of the loan, it was unlikely he would ever be called upon to personally satisfy any such deficiency. (K. Miller Decl. ¶ 6.)

## II. ANALYSIS

Plaintiffs claim that Defendant's initial tax assessment was erroneous because a taxable event did not occur when they exercised the options to purchase the Microsoft shares. Rather, Plaintiffs contend that they should have been taxed when the shares were liquidated by Paine Webber to cover margin debt. Defendant contends that Plaintiffs were correctly taxed on the difference between the fair market value and the strike price at the time they exercised the options to purchase the shares.

Both parties agree that this is a case of first impression, which turns upon the interpretation and application of Internal Revenue Code section 83 ("section 83"), treasury regulations promulgated in con-

nection therewith, and Example 2 to treasury regulation 1.83–3(a)(7).

## A. Legal Standards Applicable to Motions for Summary Judgment.

A principal purpose of the summary judgment procedure is to identify and dispose of factually unsupported claims. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Summary judgment is proper when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c).

A party moving for summary judgment who does not have the ultimate burden of persuasion at trial, must produce evidence which either negates an essential element of the non-moving party's claims or shows that the non-moving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial. *Nissan Fire & Marine Ins. Co. v. Fritz Cos.,* 210 F.3d 1099, 1102 (9th Cir. 2000). A party who moves for summary judgment who does bear the burden of proof at trial, must produce evidence that would entitle him or her to a directed verdict if the evidence went uncontroverted at trial. *C.A.R. Transp. Brokerage Co., Inc. v. Darden,* 213 F.3d 474, 480 (9th Cir.2000).

Once the moving party meets his or her initial burden, the non-moving party must go beyond the pleadings and by its own evidence "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). The non-moving party must "identify with reasonable particularity the evidence that precludes summary judgment." *Keenan v. Allan,* 91 F.3d 1275, 1279 (9th Cir.1996) (quoting *Rich-*

ards v. Combined Ins. Co., 55 F.3d 247, 251 (7th Cir.1995)) (stating that it is not a district court's task to "scour the record in search of a genuine issue of triable fact"). If the non-moving party fails to make this showing, the moving party is entitled to judgment as a matter of law. Celotex, 477 U.S. at 323, 106 S.Ct. 2548.

An issue of fact is "genuine" only if there is sufficient evidence for a reasonable fact finder to find for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248–49, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is "material" if it may affect the outcome of the case. Id. at 248, 106 S.Ct. 2505. "In considering a motion for summary judgment, the court may not weigh the evidence or make credibility determinations, and is required to draw all inferences in a light most favorable to the non-moving party." Freeman v. Arpaio, 125 F.3d 732, 735 (9th Cir.1997).

### B. Legal Standards Applicable to A Refund Suit.

In order to establish his prima facie case for a tax refund, Miller must establish (1) that the Internal Revenue Service assessment was either illegal or erroneous, and (2) the correct amount of the refund. See, e.g., Helvering v. Taylor, 293 U.S. 507, 514, 55 S.Ct. 287, 79 L.Ed. 623 (1935). "In any tax refund case, the Commissioner's deficiency determination is presumptively correct, and the taxpayer has the burden of proving such deficiency is erroneous." Niles By and Through Niles v. United States, 710 F.2d 1391, 1393 (9th Cir.1983) (citing Welch v. Helvering, 290 U.S. 111, 115, 54 S.Ct. 8, 78 L.Ed. 212 (1933)).

### C. Tax Code and Regulations Applicable to this Case.

Section 83(a), entitled "Property transferred in connection with performance of services", provides, in pertinent part,:

(a) General rule

If, in connection with the performance of services, property is transferred to any person other than the person for whom such services are performed, the excess of -

(1) the fair market value of such property ... at the first time the rights of the person having the beneficial interest in such property are transferable or are not subject to a substantial risk of forfeiture, whichever occurs earlier, over

(2) the amount (if any) paid for such property, shall be included in the gross income of the person who performed such services in the first taxable year in which the rights of the person having the beneficial interest in such property are transferable or are not subject to a substantial risk of forfeiture, whichever is applicable....

I.R.C. § 83(a) (emphasis added).

Treasury Regulation § 1.83–1(a)(1) explains that property is not taxable under section 83(a) until (1) it has been "transferred" and (2) has become "substantially vested" in the taxpayer. "[A] transfer of property occurs when a person acquires a beneficial ownership interest in such property ...." Treas. Reg. § 1.83–3(a). "Property is substantially vested ... when it is either transferable or not subject to a substantial risk of forfeiture." Treas. Reg. § 1.83–3(b). "The rights of a person in property are subject to a substantial risk of forfeiture if such person's rights to full enjoyment of such property are conditioned upon the future performance of substantial services by any individual." I.R.C. § 83(c)(1); see also Treas. Reg. § 1.83–3(c)(1) (The determination of "whether a risk of forfeiture is substantial or not depends upon the facts and circumstances", and the "risk that the value of the property will decline during a certain period of

time does not constitute a substantial risk of forfeiture.").

"The rights of a person in property are transferable only if the rights in such property of any transferee are not subject to a substantial risk of forfeiture." I.R.C. § 83(c)(2); *see also* Treas. Reg. § 1.83–3(d). For example, "property is transferable if the person performing the services or receiving the property can sell, assign, or pledge (as collateral for a loan, or as security for the performance of an obligation, or for any other purpose) his interest in the property to any person other than the transferor of such property and if the transferee is not required to give up the property or its value in the event the substantial risk of forfeiture materializes." Treas. Reg. § 1.83–3(d).

### D. Defendant Is Entitled to Judgment in Its Favor.

### 1. The Microsoft shares were transferred for purposes of section 83(a).

As noted, property is "transferred" for purposes of section 83(a), when a person acquires a beneficial ownership interest in the property. Treas. Reg. § 1.83–3(a). In general, the plain meaning of a "beneficial owner" is one "who does not have title to property but has rights in the property which are the normal incident of owning the property." *See* Blacks Law Dictionary at 156 (6th ed.1990). Plaintiffs do not dispute that they could receive dividends on and vote their shares. Plaintiffs also do not dispute that they could have disposed of the shares as they saw fit. In this case,

those facts are "normal incidents" of owning the shares. Accordingly, the Court concludes that Plaintiffs had a "beneficial ownership interest" in the shares. This, however, does not end the Court's inquiry into whether the shares were "transferred."

Plaintiffs contend that despite an admitted beneficial ownership interest, the shares were not transferred because the substance of the transaction was similar to an option grant. Plaintiffs rely on Treasury Regulation § 1.83–3(a)(2), which provides, in relevant part:

> Option. The grant of an option to purchase certain property does not constitute a transfer of such property.... In addition, if the amount paid for the transfer of property is an indebtedness secured by the transferred property, on which there is no personal liability to pay all or a substantial part of such indebtedness, such transaction may be in substance the same as the grant of an option. The determination of the substance of the transaction shall be based on upon all the facts and circumstances. The factors to be taken into account include the type of property involved, the extent to which the risk that the property will decline in value has been transferred, and the likelihood that the purchase price will, in fact, be paid.

*See also* Treas. Reg. § 1.83–3(a)(4) [5]; Treas. Reg. § 1.83–3(a)(6).[6]

In this case, the type of property involved is the actual shares of stock Plaintiffs obtained by exercising options already

---

**5.** Treasury Regulation § 1.83–3(a)(4) provides: "Similarity to option. An indication that no transfer has occurred is the extent to which the conditions relating to a transfer are similar to an option."

**6.** Treasury Regulation § 1.83–3(a)(6) provides: "Risk of loss. An indication that no transfer has occurred is the extent to which

the transferee does not incur the risk of a beneficial owner that the value of the property at the time of transfer will decline substantially. Therefore, for purposes of this (6), risk of decline in property value *is not limited to* the risk that any amount paid for the property may be lost." Treas. Reg. § 1.83–3(a)(6) (emphasis added).

granted, rather than some alternate form of property. In the Court's view, this fact weighs against finding the transaction similar in substance to the grant of an option.

Plaintiffs contend that they had no personal liability on the loan with Paine Webber and were not making payments on the loan principal. Thus, Plaintiffs contend their capital was not at stake, and they did not incur the risk that the value of the stock would decline. Plaintiffs base this argument on Example 2 to Treasury Regulation § 1.83–3(a)(7) (hereinafter "Example 2"), which provides:

> ... W sells to E 100 shares of stock in W corporation with a fair market value of $10,000 in exchange for a $10,000 note without personal liability. The note requires E to make yearly payments of $2,000 commencing in 1973. E collects the dividends, votes the stock and pays the interest on the note. However, he makes no payments toward the face amount of the note. *Because E has no personal liability on the note,* and since E is making no payments towards the face amount of the note, the likelihood of E paying the full purchase price is in substantial doubt. *As a result E has not incurred the risks of a beneficial owner that the value of the stock will decline.* Therefore no transfer of the stock has occurred ..., but an option to purchase the stock has been granted to E.

Treas. Reg. § 1.83–3(a)(7) Example 2 (emphasis added).

Plaintiffs' argument that they had no personal liability on the loan with Paine Webber is based on I.R.C. § 465(b)(4). Section 465 is entitled "Deductions limited to amounts at risk." Section 465(b)(2) provides that a "taxpayer shall be considered at risk with respect to amounts borrowed for use in an activity to the extent that he—(A) is personally liable for the repayment of such amounts." I.R.C.

§ 465(b)(2)(A). However, "a taxpayer shall not be considered at risk with respect to amounts protected against loss through nonrecourse financing, guarantees, stop loss agreements or other similar arrangements." I.R.C. § 465(b)(4).

Plaintiffs argue that the structure of the margin loan essentially constituted a "stop loss agreement," demonstrating that they were not at risk on the loan and, therefore, not personally liable. *See* Plaintiff's Motion at 21–23, 26–27. Given the fact that section 465 applies to deductions, and in light of the fact that Plaintiff has provided the Court with no authority that the term "at risk" as it is used in section 465, should be used to determine the meaning of "no personal liability" as that phrase is used in Example 2, the Court declines Plaintiff's invitation to rely on that section.

Here Plaintiffs concede that under the terms of the agreement with Paine Webber, they would be liable for a deficiency on the loan. (Motion at 27.) Plaintiffs simply contend that due to the structure of the loan, it would be unlikely that they would ever be called upon to satisfy such a deficiency. However unlikely it may be, in light of Plaintiffs' concession, the Court cannot conclude that they had "no personal liability" on the debt to Paine Webber. For this reason, the Court concludes that the facts of this case do not fall within Example 2.

The Court also finds that Plaintiffs did bear the risk that the value of the property would decline. The Court's inquiry in this regard is not limited to whether Plaintiffs would lose the price they paid to exercise the shares. Treas. Reg. § 1.83–3(a)(6). Thus, while Paine Webber was permitted to foreclose upon the shares if Plaintiffs were unable to satisfy margin calls, Plaintiffs bore the ultimate risk that the value of the shares would decline because they would lose either the shares themselves or

could have been required to put up other assets to satisfy the margin calls. This finding weighs in favor of the conclusion that the shares were transferred to Plaintiffs at the time of exercise.[7]

Finally, the Court considers the likelihood that the purchase price for the shares will be paid. In this regard, Treasury Regulation § 1.83–3(a)(2)'s express terms focus on the likelihood that the "purchase price" for the property will be paid, rather than the likelihood that indebtedness incurred to obtain the purchase price will be paid. Thus, the Court concludes that the proper construction of the regulation requires the Court to focus on the likelihood that the party transferring the property will be paid. *See Theophilos v. Commissioner*, 85 F.3d 440, 447 n. 18 ("The 'similar to an option' analysis requires a court to determine the chances that an *employer* will lost its rights in the employee's payment.").[8]

It is undisputed that Microsoft was paid the purchase price of the shares, albeit by Paine Webber. There are no facts suggesting that Microsoft would have lost its rights in that payment. Again, this finding weighs in favor of the conclusion that the shares were transferred to Plaintiffs at the time of exercise.

■ Accordingly, the Court concludes that all the facts and circumstances in this case do not render the transaction "in substance the same as the grant of an option." Rather, the Court finds that the shares were "transferred" to Plaintiffs, within the meaning of Treasury Regulation § 1.83–3(a), when Plaintiffs exercised the options.

## 2. The Microsoft shares were substantially vested in Plaintiffs when the options were exercised.

### a. The shares were not subject to a substantial risk of forfeiture at the time of exercise.

As set forth above, pursuant to I.R.C. § 83(c), "the rights of a person in property are subject to a substantial risk of forfeiture if such person's rights to full enjoyment of such property are conditioned upon the future performance of substantial services." I.R.C. § 83(c)(1). Plaintiffs conceded at the hearing on this matter that their rights in the shares were not conditioned upon the future performance of substantial services. This fact weighs in favor of finding that the shares were not subject to a substantial risk of forfeiture. However, Treasury Regulation § 1.83–3 suggests that in addition to this special rule, whether property is subject to a substantial risk of forfeiture depends upon other facts and circumstances. Treas. Reg. § 1.83–3(c)(1). For example, a substantial risk of forfeiture may exist upon "occurrence of a condition related to a purpose of the transfer, and the possibility of forfeiture is substantial if such condition is not satisfied." *Id.* In this case, however, there is no suggestion that any conditions were placed upon the exercise of the shares. Based upon the facts of this case, the Court also does not find any of the examples set forth in Treasury Regulation § 1.83–3(c)(4) to be applicable.

In the *Theophilos* case, the Ninth Circuit noted that "[t]he risk of forfeiture analysis requires a court to determine the

---

7. Plaintiffs admission that they intended to continue to own the shares but for the decline in value, further reinforces the Court's conclusion in this regard. (*See* Complaint ¶ 10.)

8. The Court notes that this interpretation of Treasury Regulation § 1.83–3(a)(2) comports

with the situation presented in Example 2, which hypothesizes that an employer gives an employee a loan, on which the employee is not required to make payments. Thus, in Example 2, it is not likely that the employer will be paid the purchase price of the property.

chances the *employee* will lose his rights in property transferred by his employer." *Theophilos,* 85 F.3d at 447 n. 18 (emphasis in original). The Court concludes that, based on the record in this case, once the Plaintiffs exercised the options, Microsoft could not have revoked their rights to the shares. The fact that Plaintiffs might have lost the actual shares because of the need to satisfy margin calls for Paine Webber does not affect the Court's finding. Any such loss would have been related to a decline in value of the shares. "The risk that the value of the property will decline during a certain period of time *does not constitute a substantial risk of forfeiture."* Treas. Reg. § 1.83–3(a)(6) (emphasis added); *id.* § 1.83–3(c)(1).

Accordingly, the Court concludes that at the time Plaintiffs exercised the shares, the shares were not subject to a substantial risk of forfeiture.

**b. The shares were transferable at the time of exercise.**

The Court also concludes that the shares were transferable at the time of exercise. Where a taxpayer "can sell, assign, or pledge (as collateral for a loan, or as security for the performance of an obligation, or for any other purpose) his interest in the property to any person other than the transferor of such property *and if the transferee is not required to give up the property or its value in the event the substantial risk of forfeiture materializes,"* the property in question is transferable. Treas. Reg. § 1.83(d) (emphasis added). In this case it is undisputed that the Plaintiffs could—and did—pledge their interest in the shares as collateral for the loan with Paine Webber. It is also undisputed that, upon exercise, Plaintiffs could have sold the shares in question. Moreover, because the Court has concluded that the shares were not subject to a substantial risk of forfeiture, the Court finds that the shares were transferable under Section 83(c).

## V. CONCLUSION

Because at the time Plaintiffs exercised the options to purchase the shares, those shares were transferred to and substantially vested in Plaintiffs, the Court concludes that Plaintiffs have not met their burden of showing they are entitled to judgment as a matter of law in their favor, and their motion for summary judgment is DENIED.

For these same reasons, the Court also finds that the Defendant has demonstrated that it is entitled to judgment in its favor, and its motion for summary judgment is GRANTED.

**IT IS SO ORDERED.**