**Jonathan PALAHNUK and Kimberly Palahnuk, Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

**No. 04–1513T.**

United States Court of Federal Claims.

Feb. 28, 2006.

Don Paul Badgley, Seattle, WA, for plaintiff.

Benjamin C. King, Jr., U.S. Department of Justice, Washington, DC, with whom was Eileen J. O'Connor, Assistant Attorney General, for defendant.

## OPINION

FIRESTONE, Judge.

This tax refund case comes before the court on cross-motions for summary judgment. The plaintiffs, Jonathan Palahnuk ("Palahnuk") and Kimberly Palahnuk (collectively, "plaintiffs"), argue that they are entitled to a refund of $627,019 of their federal income tax for tax year 2000 in connection with certain stock options they had exercised through a margin loan in that year. The plaintiffs argue that the income should have been recognized in the year 2001, when the plaintiffs paid off the loan with which they purchased the stock. The defendant, the United States ("government" or "United States"), argues that the income from the stock options was properly reported in 2000 because the options were in fact exercised in the year 2000. For the reasons that follow, the plaintiffs' motion for summary judgment is **DENIED**. The government's cross-motion is **GRANTED**.

## STATEMENT OF FACTS

The following facts are undisputed unless otherwise noted. Palahnuk and his employer, Metromedia Fiber Network, Inc. ("Me-

tromedia"), entered into two agreements granting Palahnuk options to purchase shares of Metromedia Class A common stock as compensation for his employment. The first, entered into on February 23, 1998, granted Palahnuk "Non–Qualified Stock Options" to purchase 8,160 shares of stock. The second agreement, accepted on March 30, 1998, granted the plaintiff options to purchase 53,500 shares of stock under Metromedia's "Incentive Stock Option Plan." [1]

On March 15, 2000, Palahnuk exercised some of his stock options, purchasing 26,750 shares (this was the equivalent of the 53,500 shares following a 2:1 split) of Metromedia stock using funds provided by CIBC Oppenheimer through a margin loan in the amount of $99,948.60, the exercise price of the stock options. According to information submitted by the plaintiffs, at that time the stock was worth $2,185,957.50. Pls.' Ex. A. On October 27, 2000, Palahnuk exercised his other stock options, purchasing an additional 8,160 shares of Metromedia stock. This purchase was also accomplished with funds provided by CIBC Oppenheimer through a margin loan, this time in the amount of $58,851.44, representing the exercise price of $15,238.80 plus withholding taxes of $43,342.64. At the time Palahnuk exercised his stock options, the value of the 8,160 shares of stock was $134,640.00, giving the plaintiffs an after-tax $76,058.56 profit on those shares alone.

CIBC Oppenheimer paid Metromedia in full for all the shares purchased by Palahnuk and the shares were deposited in an account in Palahnuk's name maintained by CIBC Oppenheimer. After Palahnuk exercised his stock options and purchased the stock, he became the registered owner of the stock, had the right to vote the stock, receive dividends, and pledge the stock as collateral for a loan.

Palahnuk did in fact pledge his Metromedia stock as collateral for the CIBC Oppenheimer margin loans. Under the terms of those loan agreements, Palahnuk was not required to make periodic principal or interest payments on the loan. Instead, Palahnuk was required to maintain collateral or funds in his account of a value equal to the amount of the loans plus 25%. The loan agreements also contained deficiency clauses which read: "You [CIBC Oppenheimer] may sell any or all property held in any of my accounts ... whenever in your discretion you consider it necessary for your protection.... At any such sale you may purchase the property free of any right of redemption and I shall be liable for any deficiency in my accounts." Pls.' Ex. E ¶ 11. Palahnuk's margin loan agreements were governed by "Regulation T" under the securities laws and the Rules of the New York Stock Exchange.

On March 16, 2001, Palahnuk sold certain other Metromedia stock for $323,010.38. This sale fully paid off Palahnuk's debt to CIBC Oppenheimer. Between March 22, 2001 and April 19, 2001, Palahnuk sold the 26,760 shares of stock acquired through the exercise of stock options for a total of $248,410.05, well in excess of the exercise price. On April 19, 2001, Palahnuk also sold the 8,160 shares of stock acquired through the second exercise of stock options for a total of $38,350.72, also in excess of the exercise price.

On April 16, 2001, the plaintiffs filed their tax return for tax year 2000. On that return, the plaintiffs reported as gross income the difference between the market value of the stock purchased through the exercise of non-qualified stock options and the exercise price paid, or $119,401.20. On the same return, the plaintiffs also reported as income the

---

1. These options were intended to be incentive stock options within the meaning of section 422 of the Internal Revenue Code ("I.R.C."), while the "non-qualified" options were not. Incentive stock options that fall under this section are ordinarily given preferential tax treatment, such that an employee does not realize ordinary income from the exercise of these options provided that the employee holds the stock for the requisite period of time. See I.R.C. § 421. However, for purposes of calculating income subject to the alternative minimum tax, which is at issue here, I.R.C. § 56(b)(3) provides that options that would normally not be taxable under I.R.C. § 421 are to be included in taxable income as if the options were non-qualified options and not incentive options. Thus, I.R.C. § 83 applies to both incentive stock options and non-qualified stock options for purposes of the alternative minimum tax, and therefore for purposes of this opinion as well.

difference between the market value of the stock purchased through the exercise of incentive stock options and the exercise price, or $2,086,012, pursuant to I.R.C. § 56(b)(3). *See supra,* note 1.

On April 10, 2003, the plaintiffs filed an amended return for tax year 2000, arguing that the exercises of their stock options were not taxable events in the year 2000. The plaintiffs filed this complaint on September 30, 2004, seeking a refund of $627,019. The plaintiff moved for summary judgment on May 26, 2005 and the government cross-moved on July 20, 2005. Oral argument was held on February 15, 2006.

## STATUTORY AND REGULATORY BACKGROUND

The plaintiffs argue that because they exercised the Metromedia stock options using their margin account, a form of indebtedness, they should not have recognized their income from the stock options until they paid the debt in 2001, under section 83 of the Internal Revenue Code and applicable regulations. Section 83 reads in relevant part:

(a) General rule.—If, in connection with the performance of services, property is transferred to any person other than the person for whom such services are performed, the excess of—

(1) the fair market value of such property (*determined without regard to any restriction* other than a restriction which by its terms will never lapse) at the first time the rights of the person having the beneficial interest in such property are transferable or are not subject to a substantial risk of forfeiture, whichever occurs earlier, over

(2) the amount (if any) paid for such property,

shall be included in the gross income of the person who performed such services in the first taxable year in which the rights of the person having the beneficial interest in such property are transferable or are not subject to a substantial risk of forfeiture ....

(e) Applicability of section.—This section shall not apply to—...

(3) the transfer of an option without a readily ascertainable fair market value,

(4) the transfer of property pursuant to the exercise of an option with a readily ascertainable fair market value at the date of grant, ....

Under the relevant Treasury Regulations, "property is not taxable under section 83(a) until it has been transferred ... to [an employee, independent contractor, or beneficiary thereof] and become substantially vested ... in such person." Treas. Reg. § 1.83–1(a). "Property is substantially vested ... when it is either transferable or not subject to a substantial risk of forfeiture." Treas. Reg. § 1.83–3(b). Thus, the general rule is that ordinary income is realized by an employee when property is transferred to and substantially vested in him in connection with his services. The regulations then define when property is "transferred" for purposes of recognizing ordinary income.

Generally, "a transfer of property occurs when a person acquires a beneficial ownership interest in such property." Treas. Reg. § 1.83–3(a)(1). However, "[t]he grant of an option to purchase certain property [generally] does not constitute a transfer of such property," § 1.83–3(a)(2), unless "the option has a readily ascertainable fair market value ... at the time the option is granted," Treas. Reg. § 1.83–7(a). If the option has a readily ascertainable fair market value, then "section 83(a) shall apply to such grant" and "[t]he [employee] ... realizes compensation upon such grant at the time [the option is granted]," *id.,* and does not realize income when the option is exercised, I.R.C. § 83(e)(4). In contrast, "[i]f section 83(a) does not apply to the grant of such an option because the option does not have a readily ascertainable fair market value at the time of grant, sections 83(a) and 83(b) shall apply at the time the option is exercised or otherwise disposed of .... If the option is exercised, sections 83(a) and 83(b) apply to the transfer of property pursuant to such exercise, and the employee or independent contractor realizes compensation upon such transfer at the time and in the amount determined under section 83(a) or 83(b)." *Id.* Thus, depending on whether the value of the option can be

readily ascertained, the grant of an option to purchase property is taxable either at the time of grant or at the time of exercise.

The regulations also provide an exception to the general rule that income is recognized when a "transfer" of property occurs. The regulations treat certain transfers of property as the grant of an option, thus potentially delaying the time of recognition of income until the option is exercised:

> In addition, if the amount paid for the transfer of property is an indebtedness secured by the transferred property, on which there is no personal liability to pay all or a substantial part of such indebtedness, such transaction may be in substance the same as the grant of an option. The determination of the substance of the transaction shall be based upon all the facts and circumstances. The factors to be taken into account include the type of property involved, the extent to which the risk that the property will decline in value has been transferred, and the likelihood that the purchase price will, in fact, be paid.

Treas. Reg. § 1.83–3(a)(2).

Treasury Regulation § 1.83–3(a)(7) provides the following example illustrating the operation of § 1.83–3(a)(2):

> Example (2). On November 17, 1972, W sells to E 100 shares of stock in W corporation with a fair market value of $10,000 in exchange for a $10,000 note without personal liability. The note requires E to make yearly payments of $2,000 commencing in 1973. E collects the dividends, votes the stock and pays the interest on the note. However, he makes no payments toward the face amount of the note. Because E has no personal liability on the note, and since E is making no payments towards the face amount of the note, the likelihood of E paying the full purchase price is in substantial doubt. As a result E has not incurred the risks of a beneficial owner that the value of the stock will decline. Therefore, no transfer of the stock has occurred on November 17, 1972, but an option to purchase the stock has been granted to E.

The plaintiffs argue, based on this example, that under Treasury Regulation § 1.83–3(a)(2) a transfer only occurs when an employee has placed capital at risk. Because Palahnuk exercised his Metromedia stock options using indebtedness secured by the stock and on which they contend there was no personal liability, the plaintiffs argue they did not have capital at risk, and thus no transfer occurred, until they paid their debt to CIBC Oppenheimer in 2001.

## DISCUSSION

### A. Standard of Review

This is an action for a refund of federal income taxes. In order to prevail, the plaintiffs must establish that the Internal Revenue Service's ("I.R.S.'s") assessment was either erroneous or illegal and the plaintiffs must establish the correct amount of the refund. See, e.g., Helvering v. Taylor, 293 U.S. 507, 514, 55 S.Ct. 287, 79 L.Ed. 623 (1935). The I.R.S.'s assessment is entitled to a presumption of correctness, and the plaintiffs have the burden of demonstrating that it is erroneous. See Welch v. Helvering, 290 U.S. 111, 115, 54 S.Ct. 8, 78 L.Ed. 212 (1933).

Currently pending before the court are cross-motions for summary judgment. Summary judgment is authorized when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Rule 56(c) of the Rules of the United States Court of Federal Claims ("RCFC"). The applicable standards for analyzing a motion for summary judgment are well-established. Each party moving for summary judgment bears the burden of showing the absence of any genuine issue of material fact and that it is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In the motions currently before the court, both parties allege an absence of genuine issues of material fact. Instead, the parties' dispute centers on statutory and regulatory construction, a question of law. See, e.g., Billings v. United States, 322 F.3d 1328, 1332 (Fed.Cir.2003) ("The un-

derlying issue, one of statutory and regulatory construction, is a question of law ...."). Summary judgment is therefore appropriate. *See, e.g., Dana Corp. v. United States,* 174 F.3d 1344, 1347 (Fed.Cir.1999) ("Summary judgment was appropriate here because no material facts were disputed, many being stipulated, and the only disputed issues were issues of law.").

## B. The Plaintiffs' Purchase of Stock Using Third Party Margin Debt Does Not Qualify for the Exception in Treasury Regulation § 1.83–3(a)(2)

The plaintiffs do not dispute that Palahnuk exercised the stock options he received from Metromedia or that a beneficial interest in property was transferred to him upon the exercise of the options. Instead, the plaintiffs argue that because Palahnuk incurred indebtedness and did not use his own cash to pay for the stock, this transfer of property is similar to Example (2) and therefore should be treated as the grant of an option under Treasury Regulation § 1.83–3(a)(2). The government argues that as a regulatory exception to a statutory general rule, § 1.83–3(a)(2) and Example (2) should be construed narrowly, and when they are so construed as a matter of law they do not apply to this type of situation and as a matter of fact § 1.83–3(a)(2) does not apply to the plaintiffs' situation. Each of the government's arguments will be examined in turn.

### 1. The Exercise of a Stock Option Using Third Party Margin Debt Is Not Similar to Example (2) and Therefore Example (2) Does Not Control This Case

At the core of the plaintiffs' argument is the assertion that the use of margin debt to exercise a stock option is the same as or similar to the illustration of Treasury Regulation § 1.83–3(a)(2) in Example (2). The plaintiffs argue that they did not incur any tax liability until they paid the margin debt they owed to CIBC Oppenheimer. The plaintiffs' position must be rejected.[2]

Treasury Regulation § 1.83–3(a)(2) states that a transfer of property "may be in substance the same as the grant of an option" when "the amount paid for the transfer of property is an indebtedness ...." Here, Metromedia transferred stock to Palahnuk and in exchange for this transfer Metromedia received cash. There is no dispute that Metromedia did not receive any indebtedness and does not hold any note. The plaintiffs argue that Treasury Regulation § 1.83–3(a)(2) and Example (2) in § 1.83–3(a)(7) focus on what the employee pays for the property, not what the employer receives, and therefore as long as the employee merely owes indebtedness without putting his own capital at risk, no transfer has occurred for purposes of I.R.C. § 83.

The plaintiffs' focus on the employee and whether the employee has capital at risk is misplaced. The plaintiffs' application of the regulations ignores the essence of what Example (2) describes: an alternative method of granting an employee an option to purchase property.[3] Example (2) describes a situation in which an employer, W Corporation, rather than entering into an agreement with an employee to allow him to purchase stock at a specified price for a certain period of time, actually transfers the stock to the employee but in such a way that the employee still has a certain amount of time to choose whether or not to make the transfer permanent by making a payment on the debt. In other words, in substance W Corporation grants the employee an option to purchase the

---

**2.** In so doing the court notes that it is not "confused" regarding the "fiction" created by Treasury Regulation § 1.83–3(a)(2), as the plaintiffs argue the four other courts to consider the issue were in rejecting the plaintiffs' position. *See United States v. Tuff,* 359 F.Supp.2d 1129 (W.D.Wa.2005); *Facq v. United States,* 363 F.Supp.2d 1288 (W.D.Wa.2005); *Miller v. United States,* 345 F.Supp.2d 1046 (N.D.Cal.2004); *Hilen v. Comm'r,* 90 T.C.M. 2005–226, 2005 WL 2387488 (2005).

**3.** It is for this reason that it does not matter that Example (2) is merely one example of the situation described in § 1.83–3(a)(2). What Example (2) demonstrates is that § 1.83–3(a)(2) describes an alternative method of granting an option. As discussed above, because using third party margin debt to exercise a stock option is not an alternative method by which an employer might grant an option to an employee, it does not fall under the § 1.83–3(a)(2) exception.

stock. Example (2) has nothing to do whether an employee has capital at risk; Example (2) is concerned with whether the employer has granted an employee an option to purchase property. Thus the focus should be on what the employer transferred and received in exchange, not on what the employee paid or has at risk.

Indeed, Example (2) provides: "W sells to E 100 shares of stock in W corporation with a fair market value of $10,000 in exchange for a $10,000 note without personal liability." Thus in the example it is W corporation, the transferor of the stock, who receives the note. Moreover, if E, the transferee, does not make payments when they become due, the stock is forfeited back to W corporation because the debt is secured by the stock and there is no personal liability on the note. It is in this sense that the transaction is similar to the grant of an option: the employee is under no obligation to make payments toward the purchase price of the stock, and if he chooses not to make payments by the payment date, then ownership of the stock will revert to the employer. The key feature of Example (2) is the fact that it is uncertain whether the employee will exercise his "option" to purchase the stock *from the employer* by paying the debt. As a result, even though the employee has enjoyed some of the benefits of ownership, it is uncertain whether the stock has been permanently transferred in connection with the performance of services under I.R.C. § 83 until the employee pays the debt to the employer.

The exercise of stock options using third party margin debt, the type of transaction at issue here, is therefore not similar to Example (2). For instance here, Metromedia, the employer, received cash for its stock and transferred unconditional ownership of the stock to Palahnuk. Although Palahnuk borrowed funds from CIBC Oppenheimer to pay Metromedia, if Palahnuk chose not to make payments on the debt to CIBC Oppenheimer the stock would be forfeited to CIBC Oppenheimer, not to Metromedia.[4] Accordingly, such a transaction is not similar to the grant

of an option by an employer to an employee in connection with the performance of services.

Moreover, contrary to the plaintiffs' unsupported assertions, the purpose of the subject statute and regulations is not to delay the realization of income until the taxpayer has placed his own "capital at risk." Indeed, the statute and regulations do not delay the realization of income for the grant of an option that has a readily ascertainable market value at the time of grant. *See* I.R.C. § 83(e)(3), (4); *see also* Treas. Reg. § 1.83–7(a) ("[S]ection 83(a) shall apply to such grant if the option has a readily ascertainable fair market value ... at the time the option is granted. The [employee] ... realizes compensation upon such grant at the time and in the amount determined under section 83(a)."). If the option has a readily ascertainable market value at the time of grant, then section 83 applies at the time the option is granted, and does not apply to "the transfer of property pursuant to the exercise of [the] option." I.R.C. § 83(e)(4). In such circumstances an employee will realize ordinary income at the time an option is granted. This is true even though the employee plainly does not have any capital at risk at the time the option is granted. Therefore, the purpose of the statute and regulations cannot be to delay realization of income until the employee has capital at risk.

In sum, the plaintiffs' arguments regarding the similarities between the present case and Example (2) as well as the plaintiffs' "capital at risk" theory must be rejected. The use of third party margin debt to exercise a stock option therefore does not qualify for the exception provided in § 1.83–3(a)(2).

### 2. All Factors in Treasury Regulation § 1.83–3(a)(2) Weigh Against the Plaintiffs

Not only is the exercise of stock options using third party margin debt not similar to Example (2), the facts and circumstances in-

---

4. The parties dispute whether Palahnuk had "personal liability" on the margin debt for purposes of Treasury Regulation § 1.83–3(a)(2). Although this issue is in dispute, the court has assumed, without deciding, that there was no personal liability on the note held by CIBC Oppenheimer for purposes of resolving the present motions.

dicate that the plaintiffs' transactions were not in substance the same as the grant of an option. Section 1.83–3(a)(2) provides:

> The determination of the substance of the transaction shall be based upon all the facts and circumstances. The factors to be taken into account include the type of property involved, the extent to which the risk that the property will decline in value has been transferred, and the likelihood that the purchase price will, in fact, be paid.

Three federal district courts and the U.S. Tax Court have found in similar circumstances that the purchase of stock using third party margin debt is not in substance the same as the grant of an option. *See United States v. Tuff*, 359 F.Supp.2d 1129 (W.D.Wa. 2005); *Facq v. United States*, 363 F.Supp.2d 1288 (W.D.Wa.2005); *Miller v. United States*, 345 F.Supp.2d 1046 (N.D.Cal.2004); *Hilen v. Comm'r*, 90 T.C.M. 333, 2005–226, 2005 WL 2387488 (2005). Like these courts, this court also finds that based on the factors listed in § 1.83–3(a)(2), Palahnuk's exercise of his stock options using third party margin debt was not in substance the same as the grant of an option.

First, the type of property involved is actual shares of stock. Palahnuk had the right to receive dividends, to vote the stock, and Palahnuk pledged the stock as collateral for a loan. In such circumstances this factor weighs against finding that the transaction is in substance the same as the grant of an option. *See Miller*, 345 F.Supp.2d at 1050–51.

Second, the risk that the value of the stock would decline had been transferred. The plaintiffs argue that Palahnuk did not have any capital at risk because under the structure of the margin loan agreements, if the value of the Metromedia stock declined below a level equal to the purchase price of the stock plus 25%, CIBC Oppenheimer would almost immediately sell the Metromedia stock, thereby satisfying Palahnuk's debt before a deficiency could materialize. In such circumstances, the plaintiffs argue, Palahnuk did not incur the risk that the value of the stock would decline, and therefore such risk had not been transferred.

The plaintiffs' arguments regarding whether Palahnuk had capital at risk are irrelevant. The second factor in Treasury Regulation § 1.83–3(a)(2) refers to "the extent to which the risk ... has been transferred." While facts indicating that it is the employee who bears the risk of a decline in value may suggest that the risk has been transferred from the employer/transferor of the stock, they are not necessary for such a finding. The regulation does not state that the risk must be transferred to the employee; it only inquires whether the risk has been transferred.[5] Here, either Palahnuk or CIBC Oppenheimer bore the risk of a decline in value, but Metromedia certainly did not. Therefore, the risk had been transferred from Metromedia.

Moreover, Palahnuk did bear some risk that the value of the Metromedia shares would decline. The terms of Palahnuk's margin loan agreements provided that if the value of the stock held in his accounts fell below a certain level, Palahnuk would be required to deposit additional assets to maintain the level, or CIBC Oppenheimer would sell the stock to satisfy the debt. *See Miller*, 345 F.Supp.2d at 1051–52. These consequences would only occur if the value of the stock declined; therefore, Palahnuk bore some risk that the value of the stock would decline. These facts and circumstances indicate that the risk had been transferred, and thus the court finds that the second factor also weighs against finding that the transaction was in substance the same as the grant of an option.

---

**5.** In this regard the court notes that the plaintiffs' reliance on Treasury Regulation § 1.83–3(a)(6) is misplaced. Although this subsection refers to whether the transferee has incurred the risk that the value of the property will decline, this is a factor for a different exception to the general rule regarding when a transfer has occurred; it is not one of the factors to be used in the "indebt-edness" exception described in § 1.83–3(a)(2). This second, different exception provides: "Similarly, no transfer may have occurred where property is transferred under conditions that require its return .... Factors which indicate that no transfer has occurred are described in paragraph (a)(4), (5), and (6) of this section." Treas. Reg. § 1.83–3(a)(3).

Third, it was likely that the purchase price of the stock would in fact be paid. Indeed, the purchase price of the stock was paid to Metromedia. In this regard the court adopts the *Miller* court's construction of the regulation. Because the regulation's "express terms focus on the likelihood that the 'purchase price' for the property will be paid, rather than the likelihood that indebtedness incurred to obtain the purchase price will be paid," the court concluded that the regulation required the court "to focus on the likelihood that the party transferring the property will be paid." 345 F.Supp.2d at 1052. In *Miller*, as in the present case, there was no dispute that the transferor of the stock had been paid the purchase price for the stock. In such circumstances, the third factor also weighs against finding that the substance of the transaction was the same as the grant of an option.

In sum, because the facts and circumstances indicate that the transaction was not in substance the same as the grant of an option, a transfer of stock occurred for purposes of I.R.C. § 83 at the time that Palahnuk exercised his stock options in the year 2000. Accordingly, the government is entitled to judgment in its favor.

## CONCLUSION

For the foregoing reasons, the plaintiffs' motion for summary judgment is **DENIED**. The government's cross-motion is **GRANTED**. Because there are no issues remaining in the case, the Clerk is directed to enter judgment accordingly. Each party is to bear its own costs.

**IT IS SO ORDERED.**