# United States Court of Appeals for the Federal Circuit

2006-5069


JONATHAN PALAHNUK,
and KIMBERLY PALAHNUK,

Plaintiffs-Appellants,

v.


UNITED STATES,

Defendant-Appellee.



Don Paul Badgley, Badgley-Mullins Law Group, of Seattle, Washington, argued for plaintiffs-appellants.

Joan I. Oppenheimer, Attorney, Tax Division, United States Department of Justice, of Washington, DC, argued for defendant-appellee. With her on the brief were Eileen J. O'Connor, Assistant Attorney General, and Richard Farber, Attorney.


Appealed from: United States Court of Federal Claims

Judge Nancy B. Firestone

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

2006-5069

JONATHAN PALAHNUK,
and KIMBERLY PALAHNUK,

Plaintiffs-Appellants,

v.

UNITED STATES,

Defendant-Appellee.

_____

DECIDED:  February 12, 2007
_____

Before MAYER, BRYSON and DYK, Circuit Judges.

MAYER, Circuit Judge.

Jonathan and Kimberly Palahnuk ("Appellants") appeal from the judgment of the United States Court of Federal Claims that income from stock options was taxable in the year they exercised their options rather than when they paid off the margin loan used to purchase the stock.  Palahnuk v. United States, 70 Fed. Cl. 87 (2006).  We affirm.

## Background

Jonathan Palahnuk ("Palahnuk") entered into two agreements with his employer, Metromedia Fiber Network, Inc. ("Metromedia"), to purchase shares of Metromedia Class A common stock.  The first agreement gave him the option to purchase 8,160 shares and the second gave him the option to purchase an additional 53,520 shares.

On March 15, 2000, Palahnuk exercised some of these options to purchase 26,760 shares[1] of Metromedia stock. He paid for these shares using a margin loan from CIBC Oppenheimer ("Oppenheimer") in the amount of $99,948.60. At the time of purchase, the shares were worth $2,185,957.50. On October 27, 2000, Palahnuk exercised options to purchase an additional 8,160 shares of Metromedia stock. This purchase was also financed with a margin loan from Oppenheimer, this one for $58,851.44.[2] At the time of purchase, these shares were worth $134,640.00.

Palahnuk used the Oppenheimer loans to pay Metromedia in full when these stock transactions occurred. The shares were then deposited in an account in Palahnuk's name that was maintained by Oppenheimer. Upon exercising his options, Palahnuk became the registered owner of the stock, and acquired the right to vote the shares, receive dividends, and pledge the stock as collateral for a loan; Oppenheimer obtained a security interest in the shares; and Metromedia was completely divested of any interest in the shares because it had been paid in full with the funds from the margin loan.

Per his agreement with Oppenheimer, Palahnuk was not required to make any periodic principal or interest payments on the margin loan. Rather, he merely was required to maintain a predetermined minimum balance of cash and/or collateral in his Oppenheimer account. The loan agreement included deficiency clauses whereby

---

[1] As the result of a 2:1 split, these 26,760 shares were the equivalent of 53,520 shares when the second option was granted.

[2] This represented the exercise price of $15,238.80, plus withholding taxes of $43,342.64.

Oppenheimer was authorized to liquidate the stock if the account balance fell below this minimum threshold, and Palahnuk agreed to be liable for any deficiency in his accounts.

On March 16, 2001, Palahnuk sold other stock and used the proceeds to pay off the Oppenheimer margin loans at issue here. Later in 2001, he sold all of the Metromedia stock at issue for a total of $286,760.77. While this amount was greater than the exercise price of $115,187.40, it was significantly less than the value of the stock when the options were exercised in 2000, i.e., $2,320,597.50.

Appellants initially reported their profit from these transactions as gross income on their tax return for tax year 2000. They showed gross income from this transaction of $2,205,413.20, which was the difference between the market value of the stock at the time of purchase and the price they paid to exercise their options.

On April 10, 2003, however, the appellants filed an amended return for tax year 2000, seeking a refund of $627,019 plus interest. They asserted that the stock transactions were taxable events when they paid off the margin loan in 2001, rather than when they obtained ownership of the stock from Metromedia in 2000. The IRS took no action on their amended return, leading them to file this case. The Court of Federal Claims ruled in favor of the government on cross motions for summary judgment and dismissed the case. Appellants appeal, and we have jurisdiction under 28 U.S.C. § 1295(a)(3).

### Discussion

We review the trial court's grant of summary judgment <u>de novo</u>, reapplying the same standard used by the trial court. <u>Lacavera v. Dudas</u>, 441 F.3d 1380, 1382 (Fed. Cir. 2006). Summary judgment is appropriate when "the pleadings, depositions,

answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(c) of the Rules of the United States Court of Federal Claims; see also Dana Corp. v. United States, 174 F.3d 1344, 1347 (Fed. Cir. 1999).

Pursuant to I.R.C. § 83(a), the financial gain realized by an employee upon exercising stock options is taxable as gross income in the year that the options were exercised if two prerequisites are satisfied. First, the shares must be "transferred" to the employee, which occurs when the employee acquires "a beneficial ownership interest" in the stock. Treas. Reg. §§ 1.83-1(a)(1), -3(a)(1). Second, the shares must become "substantially vested" in the employee, which happens when the stock becomes "either transferable or not subject to a substantial risk of forfeiture." Id. §§ 1.83-1(a)(1), -3(b). If both conditions are satisfied, the employee realizes gross income equal to the difference between the fair market value of the stock at the moment it became substantially vested, and the amount paid to exercise the stock options. Id. § 1.83-1(a)(1).

1. Whether a transaction is a stock transfer or the grant of an option to purchase the stock in the future is a question of fact. Id. § 1.83-3(a)(2). This determination is made by analyzing "the type of property involved, the extent to which the risk that the property will decline in value has been transferred, and the likelihood that the purchase price will, in fact, be paid." Id.

Upon exercising his stock options, the purchase price of the stock was, in fact, paid to Metromedia, and Palahnuk became the beneficial (and actual) owner of the

stock. Any risk of decline in the value of the shares was transferred from Metromedia to Palahnuk; whether Palahnuk ultimately transferred that risk to Oppenheimer has no bearing on our analysis. A transfer from Metromedia to Palahnuk indisputably occurred in 2000.

Palahnuk incorrectly cites Example (2) of Treas. Reg. § 1.83-3(a)(7)[3] as support for his position that a transfer did not occur until he repaid the margin loan. The corporation in that example was never paid for the stock, and since the employee did not have any personal liability on the note used to pay for the stock, there is a very real possibility that the corporation would never be paid. That is significantly different from our scenario because Metromedia was paid in full and transferred all of its rights in that stock to Palahnuk.

A better analogy can be drawn from common real estate transfers. The buyer obtains a mortgage loan from a bank to pay the seller for the property. At closing, the seller is paid in full with the funds from the mortgage loan, and is completely divested of

---

[3] Example (2) of Treas. Reg. § 1.83-3(a)(7) provides as follows:

> On November 17, 1972, W sells to E 100 shares of stock in W corporation with a fair market value of $ 10,000 in exchange for a $10,000 note without personal liability. The note requires E to make yearly payments of $2,000 commencing in 1973. E collects the dividends, votes the stock and pays the interest on the note. However, he makes no payments toward the face amount of the note. Because E has no personal liability on the note, and since E is making no payments towards the face amount of the note, the likelihood of E paying the full purchase price is in substantial doubt. As a result E has not incurred the risks of a beneficial owner that the value of the stock will decline. Therefore, no transfer of the stock has occurred on November 17, 1972, but an option to purchase the stock has been granted to E.

his interest in the property; the buyer becomes the beneficial owner of the property, obtaining all the rights and privileges associated with owning the property, but also incurring the risk of loss should the property be damaged or destroyed; and the bank obtains a security interest on the property in the form of a mortgage. No one would dispute that a transfer has occurred in this situation, and it is equally certain that a transfer occurred when the stock options were executed, regardless of whether the transaction was funded with the buyer's own cash or a margin loan from a broker.

2. Whether the stock was substantially vested is also a question of fact. Treas. Reg. § 1.83-3(b), (c). Stock becomes substantially vested "when it is either transferable or not subject to a substantial risk of forfeiture." Id. § 1.83-3(b). "A substantial risk of forfeiture exists where" the property rights that were transferred are conditioned "upon the future performance (or refraining from performance) of substantial services by any person, or the occurrence of a condition related to a purpose of the transfer [wherein] the possibility of forfeiture is substantial if such condition is not satisfied." Id. § 1.83-3(c)(1).

There is no evidence on the record suggesting any possibility that Palahnuk's rights in the stock could have been revoked by Metromedia. That Oppenheimer could have sold Palahnuk's stock in certain situations is of no moment. The transfer from Metromedia to Palahnuk had already occurred, and what Palahnuk chose to do with his stock thereafter is irrelevant. The stock became substantially vested in Palahnuk at the moment he executed his options in 2000.

Therefore, the transaction was a taxable event in 2000, the tax year during which the stock options were exercised by Palahnuk, rather than when he fully repaid the

Oppenheimer margin loan in 2001.  Accord Cidale v. United States, No. 05-51372, 2007 WL 49636 (5th Cir. Jan. 9, 2007); United States v. Tuff, 469 F.3d 1249 (9th Cir. 2006); Miller v. United States, No. 04-17470, 2006 WL 3487016 (9th Cir. Dec. 4, 2006); see also Facq v. United States, 363 F. Supp. 2d 1288 (W.D. Wash. 2005); Racine v. Comm'r, 92 T.C.M. (CCH) 100, 2006 WL 2346444 (2006).

## Conclusion

Accordingly, the judgment of the United States Court of Federal Claims is affirmed.

## AFFIRMED