T.C. Memo. 2007-2

UNITED STATES TAX COURT

EDWARD L. WALTER AND JAMIE K. WALTER, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 8321-05.                    Filed January 3, 2007.

Deborah R. Jaffe and Robert M. McCallum, for petitioners.

Julie L. Payne, for respondent.

MEMORANDUM OPINION

LARO, Judge:  This case is before the Court for decision
without trial.  See Rule 122.[1]  Petitioners petitioned the Court
to redetermine respondent's determination of a $167,401

---

[1] Rule references are to the Tax Court Rules of Practice and
Procedure.  Unless otherwise indicated, section references are to
the applicable versions of the Internal Revenue Code.

deficiency in their 2000 Federal income tax and an addition to tax of $5,197.70 under section 6651(a). After concessions by respondent, we are left to decide the date on which to value stock transferred to Edward Walter (petitioner) through his exercise of stock options. Respondent argues that the appropriate valuation date is July 14, 2000. Petitioners argue that the appropriate valuation date is July 18, 2000. We agree with respondent.

## Background

All facts were stipulated or contained in the exhibits submitted therewith. We find the facts accordingly. At the time of the filing of the petition herein, petitioners resided on Bainbridge Island, Washington.

### Stock Option Grants

Petitioner was employed by Primus Knowledge Solutions Inc. (Primus), until his employment terminated on May 5, 2000. As an employee of Primus, petitioner was granted three separate options to purchase its publicly traded common stock. More specifically, respective stock option letter agreements dated February 4, 1999, granted petitioner a nonqualified stock option (first option) to purchase 78,182 shares of Primus stock, a nonqualified stock option (second option) to purchase 16,666 shares of Primus stock, and an incentive stock option (third option) to purchase 48,484 shares of Primus stock. The exercise price under each of these

options was $8.25 per share.  As of July 2000, petitioner was
sufficiently vested to purchase 27,676 of the shares mentioned in
the first option, 5,899 of the shares mentioned in the second
option, and 17,163 of the shares mentioned in the third option.

The stock option letter agreements pertaining to the first
and second options provided for payment of the exercise price of
the shares described therein as follows:

> The option may be exercised by the delivery of: (a)
> Cash, personal check (unless, at the time of exercise,
> the Plan Administrator[2] determines otherwise), bank
> certified or cashier's check; or (b) Unless the Plan
> Administrator in its sole discretion determines
> otherwise, shares of the capital stock of the Company
> held by you for a period of at least six months having
> a fair market value at the time of exercise, as
> determined in good faith by the Plan Administrator,
> equal to the exercise price.  * * *  As a condition to
> the exercise of a non-qualified stock option, you shall
> make such arrangements as the Company may require for
> the satisfaction of any federal, state or local
> withholding tax obligations that may arise in
> connection with such exercise.

The stock option letter agreement pertaining to the third option
provided for payment of the exercise price of the shares
described therein as follows:

> Unless the Plan administrator at any time determines
> otherwise, the option may be exercised by the delivery
> of: (a) Cash, personal check, bank certified or
> cashier's check; or (b) Shares of the capital stock of
> the Company held by you for a period of at least six
> months having a fair market value at the time of

---

[2] Primus's 1995 Stock Incentive Compensation Plan (the
1995 Plan) defined the "Plan Administrator" as Primus's board of
directors or any properly designated committee of the board.

exercise, as determined in good faith by the Plan Administrator, equal to the exercise price.

<u>1995 Stock Incentive Compensation Plan</u>

The stock options granted by the three stock option letter agreements were granted pursuant to the 1995 Plan, and each of those agreements incorporated the 1995 Plan by reference. Section 7.4 of the 1995 Plan states that an optionee may exercise his or her stock options "by written notice to the Company, in accordance with procedures established by the Plan Administrator, setting forth the number of shares with respect to which the Option is being exercised and accompanied by payment in full as described in Section 7.5 of the Plan." Section 7.5 of the 1995 Plan states that payment in full may be made by the following means:

> The exercise price for shares purchased under an Option shall be paid in full to the Company [Primus] by delivery of consideration equal to the product of the Option exercise price and the number of shares purchased. Such consideration must be paid in cash, except that the Plan Administrator may, either at the time the Option is granted or at any time before it is exercised and subject to such limitations as the Plan Administrator may determine, authorize payment in cash and/or one or more of the following alternative forms: (i) Common Stock already owned by the Holder for at least six months (or any shorter period necessary to avoid a charge to the Company's earnings for financial reporting purposes) having a Fair Market Value on the day prior to the exercise date equal to the aggregate Option exercise price; (ii) a promissory note authorized pursuant to Section 11 of the Plan; (iii) if the Common Stock is publicly traded, delivery of a properly executed exercise notice, together with irrevocable instructions, to (a) a brokerage firm designated by the Company to deliver promptly to the

Company the aggregate amount of sale or loan proceeds to pay the Option exercise price and any withholding tax obligations that may arise in connection with the exercise and (b) the Company to deliver the certificates for such purchased shares directly to such brokerage firm, all in accordance with the regulations of the Federal Reserve Board; or (iv) such other consideration as the Plan Administrator may permit.

Section 14 of the 1995 Plan states that Primus may require an optionee to pay Primus the amount of any withholding tax that Primus is required to withhold with respect to the grant, exercise, payment, or settlement of the option. The 1995 Plan does not provide for postponing the delivery of shares of stock to an optionee who exercises a stock option.

Petitioner's Piper Jaffray Account

During all periods relevant to this case, U.S. Bancorp Piper Jaffray (Piper Jaffray) was a brokerage firm designated by Primus as one authorized to pay the optionee's exercise price and receive the optionee's certificates for purchased shares. On July 13, 2000, petitioner opened an asset management account at Piper Jaffray. Petitioner stated on the application that his annual income was $150,000, that his net worth, excluding his home, was more than $999,000, and that his liquid net worth (e.g., his cash and securities holdings) totaled $500,000. The account gave petitioner "automatic access to credit extension (pre-approved loans at competitive rates)." Petitioner's account at Piper Jaffray was subject to an Asset Management Account Agreement, Disclosure Statement, and Application (PJ account

agreement).  The PJ account agreement stated, in part, that petitioner's account included a "ready purchase credit feature". That feature allowed petitioner to purchase securities on credit of up to 50 percent of the current market value of eligible securities in his account.  If petitioner used this feature, any securities in his Piper Jaffray account became collateral for the extended credit and, in the event of a default by petitioner in repaying the extension of credit, could be sold by Piper Jaffray to reduce or to liquidate entirely any debit balances in his account.

As to any order that petitioner placed with Piper Jaffray for the purchase of securities, the PJ account agreement stated:

> When I buy securities, you will first apply any cash in my Account on the settlement date to pay for the purchase.  If there is insufficient cash, you will then redeem Fund shares at net asset value to pay the amount due.
>
> If there are not enough Fund shares in the Account to pay this amount, the trade will be treated as a credit transaction.  You may extend credit to me on the terms and conditions set forth in this Agreement.  Any credit you extend to me will be automatically collateralized by eligible securities in my account. If there are not sufficient eligible securities in the Account, I must deposit additional cash or eligible securities into my Account within the timeframes required by regulations and your policies.  If cash or eligible securities are not deposited on time, you may liquidate the securities at market risk and exposure to me.

Stock Option Notice of Exercise and Exercise

In order for petitioner to exercise his stock options from Primus, Piper Jaffray used a 1-page form (notice). The notice was drafted on Piper Jaffray letterhead and was entitled "Stock Option Notice of Exercise". The top half of the notice allowed petitioner to advise Primus that he was exercising his stock options and to instruct Piper Jaffray on the manner in which he would pay for the exercise by checking one of three boxes with corresponding instructions.[3] The top half of the notice also advised Primus that Piper Jaffray was enclosing its check (or checks) payable to Primus as "the TOTAL PAYMENT amount representing the exercise price due as a result of the stock option exercise", instructed Primus to deposit into petitioner's Piper Jaffray account the shares he purchased by exercising his stock options, and contained lines on which petitioner should enter certain specified personal information and sign his name with a date of signature. The bottom half of the notice contained a statement that Primus verified the information set forth on the top half of the notice and that it would deliver the requested shares to Piper Jaffray within 3 business days or a reasonable time thereafter. The bottom half of the notice also

---

[3] The respective instructions to the three boxes were: "SAME DAY SALE: Exercise your stock options by selling all shares immediately"; "CASHLESS EXERCISE: Exercise your stock options by selling enough shares to cover exercise cost"; and "EXERCISE AND HOLD: Margin stock to exercise options and hold at US Bancorp Piper Jaffray. Interest rates will be charged according to current margin rates".

contained a space that Piper Jaffray desired Primus to sign to acknowledge its verification.[4]

On July 13, 2000, petitioner signed his notice, and either he or Piper Jaffray faxed the notice to Primus after Primus's close of business. The notice stated that petitioner was exercising his options to purchase 44,791 shares and that the total due was $369,525.75.[5] In payment of those shares, petitioner checked the box corresponding to "SAME DAY SALE: Exercise your stock options by selling all shares immediately." At 7:30 a.m., of the next day, July 14, 2000, Piper Jaffray faxed Primus a second notice that consisted of the notice faxed the day before with two alterations; the first alteration crossed out the election of the same day sale, and the second alteration checked the box corresponding to "EXERCISE AND HOLD" and circled that box and the related instructions. The notice faxed on July 14, 2000, was accompanied by a cover sheet that explained that the first notice was incorrect in that petitioner was exercising and holding his shares rather than selling them. The cover sheet also explained that petitioner on that day was wiring $369,525.75 to Piper Jaffray and that Piper Jaffray would forward those proceeds to Primus when received. On July 14, 2000, $370,000 was

---

[4] It does not appear that Primus signed the statement on petitioner's notice.

[5] 44,791 shares multiplied by a per share exercise price of $8.25 equals $369,525.75.

transferred by wire from petitioner's account at Charles Schwab to petitioner's account at Piper Jaffray.

Piper Jaffray sent Primus two checks drawn on petitioner's Piper Jaffray account. The first check, in the amount of $369,525.75 and dated July 18, 2000, was for payment of the exercise price. The second check, in the amount of $385,711.80 and dated July 20, 2000, was for payment of withholding tax on the exercise of petitioner's nonqualified stock options. Petitioner used credit from Piper Jaffray to fund $385,170.74 of the $385,711.80.

On July 20, 2000, Primus prepared three confirmations. The confirmations reported that petitioner, on July 14, 2000, had exercised his first, second, and third options in purchase of 24,432 shares, 5,208 shares, and 15,151 shares, respectively, at a market value per share of $52.4375. On each weekday from Friday, July 14 through Thursday, July 20, 2000, shares of Primus common stock had a closing price and an average high/low price as follows:

|  | Closing Price | High/Low Average |
|---|---|---|
| July 14 | $52.31 | $52.4375 |
| 17 | 46.25 | 49.25 |
| 18 | 38.00 | 41.28 |
| 19 | 40.0625 | 40.685 |
| 20 | 40.00 | 41.375 |

Form W-2 Issued to Petitioner and Petitioners' 2000 Return

Petitioner received from Primus a 2000 Form W-2, Wage and Tax Statement, reporting income of $1,449,373.65 from wages, tips, and other compensation.  Primus reported that $1,309,717.50 of this amount was attributable to the exercise of petitioner's stock options.[6]  In calculating petitioner's 2000 income from the exercise of his stock options, Primus used a market value per share of $52.4375, which amount is the shares' high/low average on July 14, 2000.

On their joint 2000 Federal income tax return, petitioners reported income from wages, salaries, tips, etc. of $1,474,374, which amount represents all of the income reported as paid to petitioner on the Forms W-2 issued by Primus and the Illinois Institute of Technology.[7]  On line 21 ("Other income") of their return, petitioners reduced their gross income by $366,795.  This amount reflects a per share value of $40.0625 for Primus stock purchased by the exercise of petitioner's nonqualified stock options, which value was the closing price for Primus common stock on July 19, 2000.

---

[6] This figure equals the 29,640 shares purchased through the exercise of the first and second options multiplied by the high/low average of $52.4375, less the 29,640 shares multiplied by the $8.25 per share exercise price; in other words, (29,640 x $52.4375) - (29,640 x $8.25) = $1,309,717.50.

[7] In addition to the Form W-2 issued by Primus, a Form W-2 was issued to petitioner by the Illinois Institute of Technology in the amount of $25,000.

Discussion

Section 83(a) generally provides that when property is transferred to a person in connection with the performance of services, the fair market value of the property at the first time the rights of the person having the beneficial interest in the property are transferable or not subject to a substantial risk of forfeiture, less the amount paid for the property, is includable in the gross income of the person who performed the services. See Tanner v. Commissioner, 117 T.C. 237, 241 (2001), affd. 65 Fed. Appx. 508 (5th Cir. 2003). In general, an employee who receives a nonstatutory stock option without a readily ascertainable fair market value is taxed not on the receipt of the option, but at the time, pursuant to the employee's exercise of the option, the shares have been transferred to, and become substantially vested in, the employee. See sec. 83(a), (e)(3); Tanner v. Commissioner, supra at 242; sec. 1.83-1(a)(1), Income Tax Regs. Shares become substantially vested in the employee when the shares are either transferable or not subject to a substantial risk of forfeiture. See Racine v. Commissioner, T.C. Memo. 2006-162; Facq v. Commissioner, T.C. Memo. 2006-111; sec. 1.83-3(b), Income Tax Regs.

The parties do not argue that the disputed shares were nontransferrable or that petitioner's right to full enjoyment of the shares was conditioned upon the future performance of

substantial services.  Resolution of the issue before us turns on the date of the transfer of the shares to petitioner.  See sec. 1.83-3(a), Income Tax Regs.  For purposes of section 83 and the regulations thereunder, a transfer of property occurs when a person acquires a beneficial ownership interest in the property. See sec. 1.83-3(a)(1), Income Tax Regs.

Petitioner's rights in the Primus stock subject to option are fixed by the terms of the 1995 Plan and the stock option letter agreements.  Thus, the determination of when petitioner acquired a beneficial interest in the Primus stock requires an analysis of the contract provisions set forth in those documents. These provisions define and establish when the exercise is complete, so as to constitute a transfer of a beneficial interest to petitioner.

We read those documents to conclude that petitioner acquired a beneficial ownership interest in his Primus stock on the day the notice became effective; i.e., on July 14, 2000. Petitioner's notice was first faxed to Primus after the close of business on July 13, 2000, and was superseded by the second notice faxed to Primus the next morning.  The transmission of the notice, as superseded, satisfied the requirements for exercising the options set forth in section 7.4 of the 1995 Plan:  It was a written notice, delivered to Primus, specifying the number of shares to be purchased, and accompanied by payment in full as

described in section 7.5 of the 1995 Plan.  Both the writing of a check to Primus and the crediting of the shares to petitioner's brokerage account were but ministerial acts done in furtherance of his exercise of July 14, 2000.

Petitioners argue that the exercise of the stock options did not occur until July 18, 2000, because that is when full payment of the exercise price of the shares took place in the form of the issuance and delivery by Piper Jaffray of a check in full payment of the exercise price.  Petitioner's notice, as superseded, provided for payment in a method, as an alternative to a cash payment, that was permitted by section 7.5(iii) of the 1995 Plan and was sufficient to validate and make effective the notice on July 14, 2000.  Petitioners argue that this method was unavailable to petitioner as a means by which to exercise his options because it was not expressly provided for in the stock option letter agreements entered into between petitioner and Primus.  We disagree.  It was not necessary for that method to be expressly provided for in those agreements because the agreements specifically state that the terms of the options are as set forth in the 1995 Plan and the stock option letter agreements, that the agreements are subject to and in accordance with the express terms and conditions of the 1995 Plan and are in all respects limited by and subject to the express terms and provisions of the 1995 Plan, and that the terms set forth in the agreements are a

summary of the most important terms set forth in the 1995 Plan. A copy of the 1995 Plan was attached to and expressly incorporated by reference into each of the stock option letter agreements.

Although not mentioned by petitioners, we recognize that section 7.5(iii) of the 1995 Plan states that irrevocable instructions shall be given to pay not only the option price but any withholding obligations as well and that the total amount shown as due on the notice does not include any withholding tax. We do not believe that this fact means that petitioner's exercise of his options was not effective on July 14, 2000. To be sure, Primus considered petitioner to have met (and treated petitioner as having met) all of the requirements to have exercised his options in purchase of the stock on July 14, 2000. Primus issued to petitioner the confirmations reporting that he had exercised his options on that date, and it issued to him the Form W-2 valuing the stock as of that date. Primus's view on the date on which petitioner exercised his options is especially probative here where, notwithstanding the applicability of section 7.5(iii) of the 1995 Plan, section 7.5(iv) of the 1995 Plan allowed the plan administrator to accept in exercise of the options any form of consideration that it desired.

Moreover, by way of the notice, petitioner on July 14, 2000, gave irrevocable instructions to Piper Jaffray to purchase Primus

stock through an exercise of his options and directed Primus to issue the stock to him by placing the stock in his Piper Jaffray account.  Petitioner also directed Piper Jaffray to hold the stock and to purchase the stock on margin to generate any funds necessary to pay for the purchase.  The fact that the notice did not state specifically that Primus was also instructed to forward to Primus any withholding obligation connected to the exercise of the options does not necessarily mean that Primus as of that date was not obligated to do so.  Given petitioner's instructions to Piper Jaffray and his PJ account agreement with Piper Jaffray, Piper Jaffray was required to pay promptly to Primus all costs related to petitioner's exercise of his options in purchase of the Primus stock, and such costs would have included the prompt depositing of the withholding taxes if and when required.  In this regard, section 7.5(iii) of the 1995 Plan did not require that the option exercise price or any withholding obligation be tendered with the exercise notice in order to make the notice effective; it simply stated that the optionee must instruct the brokerage firm to deliver the option exercise price and any withholding tax obligations "promptly".  Nor do the stock option letters require that petitioner actually pay the withholding tax, just that he "make such arrangements as the Company may require for the satisfaction" of any withholding obligations connected to the exercise.

Petitioners further argue that even if petitioner had been authorized to pay the exercise price by the method set forth in section 7.5(iii) of the 1995 Plan, such attempt was ineffective because petitioner gave irrevocable instructions neither to Primus nor to Piper Jaffray.  We find petitioners' arguments on this point unavailing.  On July 14, 2000, Primus became obligated to issue the shares, and Piper Jaffray became obligated to pay for them, either by selling the shares or advancing funds on margin.  Petitioner's July 14, 2000, notice constitutes his unconditional acceptance of Primus's offer under the stock option grants and created a contract between Primus and petitioner for the sale of the exercised shares of stock.  Petitioner could not revoke or withdraw his acceptance of Primus's offer.  Moreover, petitioners have not shown that petitioner's exercise was conditional or that he reserved the right to revoke the notice.

A "beneficial owner" is one who does not have legal title to property but has rights in the property which are the normal incidents of owning property.  Miller v. United States, 345 F. Supp. 2d 1046, 1050 (N.D. Cal. 2004).  Such rights include the right to receive dividends on and vote the shares, the right to dispose of the shares as the beneficial owner sees fit, and the right to use the shares as collateral.  See United States v. Tuff, 359 F. Supp. 2d 1129, 1133 (W.D. Wash. 2005); Miller v. United States, supra at 1050.  Another indication that a transfer

has occurred is the extent to which the transferee incurs the risk that the value of the property at the time of transfer will decline.  Sec. 1.83-3(a)(6), Income Tax Regs.

As of July 14, 2000, petitioner could dispose of his Primus stock as he saw fit.  In fact, according to his notice, petitioner provided for the sale on July 14, 2000, of all of the Primus shares he obtained by exercising his stock options.  This sale would have taken place if petitioner had not again exercised control over those shares by changing his sell order.  Petitioner also evidenced his beneficial ownership interest in the Primus shares by using at least some of those shares as collateral for the funds he borrowed from Piper Jaffray.  Petitioner used credit from Piper Jaffray to fund $385,170.74 of the $385,711.80 paid to Primus for withholding taxes on the exercise of the stock options.  Under petitioner's PJ account agreement, petitioner's use of credit caused the securities in his account (consisting largely of the Primus stock he purchased by exercising his stock options) to become collateral for that credit.

Also on July 14, 2000, petitioner incurred the risk of a beneficial owner that the value of his Primus stock would decline.  According to his notice, petitioner determined to eliminate this risk by electing to sell all of his Primus stock immediately after exercise.  When petitioner changed his mind and

canceled his sell order, he chose to hold his Primus stock and to bear the risk of a decline in its value.

We hold for respondent.  We have considered all arguments made by petitioners for a contrary holding and found those arguments not discussed herein to be without merit.  To reflect the foregoing,

<u>Decision will be entered</u>

<u>under Rule 155</u>.