T.C. Memo. 2006-111

UNITED STATES TAX COURT

JEAN-REMY FACQ AND JENNIFER HUFF-FACQ, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 2757-05.                     Filed May 23, 2006.

<u>Don Paul Badgley</u> and <u>Brian Gary Isaacson</u>, for petitioners.

<u>Kirk M. Paxson</u> and <u>William C. Schmidt</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

KROUPA, <u>Judge</u>:  Respondent determined a $6,706,234
deficiency in petitioners' Federal income taxes and determined
that petitioners were liable for a $1,341,246.80 accuracy-related
penalty under section 6662(a)[1] for 2000.[2]  We are asked to

_____

[1]All section references are to the Internal Revenue Code in
effect for the year at issue, and all Rule references are to the
Tax Court Rules of Practice and Procedure, unless otherwise
indicated.

[2]Respondent also determined a $73,512 deficiency and
                                        (continued...)

decide, after concessions,[3] whether petitioners received income in 2000 when petitioner Jean-Remy Facq[4] (Mr. Facq) exercised his stock options through a margin account and whether petitioners are liable for the accuracy-related penalty under section 6662(a) for 2000. We hold that petitioners received income in 2000 when Mr. Facq exercised his stock options, but petitioners are not liable for the accuracy-related penalty for 2000.

### FINDINGS OF FACT

The parties agree that there is no genuine issue of material fact regarding the stock option income issue and that decision may be made as a matter of law. The facts regarding the accuracy-related penalty have been fully stipulated pursuant to Rule 122.[5] The stipulation of facts and the accompanying exhibits are incorporated by this reference. Petitioners resided in Kirkland, Washington, at the time they filed the petition.

---

[2](...continued) determined that petitioners were liable for a $14,702.40 accuracy-related penalty for 2001. The parties have resolved all issues relating to 2001 in a stipulation of settled issues, and we shall not consider this year further.

[3]Petitioners have conceded certain arguments petitioners made in their petition with respect to the taxability of the transaction at issue in this case.

[4]Petitioner Jennifer Huff-Facq (Mrs. Facq) is a petitioner in this case because she filed a joint income tax return with her husband, Jean-Remy Facq, for 2000.

[5]This case was originally before the Court on the parties' motions for partial summary judgment as to the stock option income issue. At the hearing on the parties' motions, the parties informed the Court that the accuracy-related penalty portion of this case could be fully stipulated for decision.

Mr. Facq's Employment

Mr. Facq is a skilled software designer. After working at Microsoft in the MSN department for about 5 years, he decided to leave when Microsoft canceled a project in which he had devoted significant time during the mid-1990s. He began to talk to other employees at Microsoft to see whether other opportunities were available. A friend introduced him to Naveen Jain (Mr. Jain), another Microsoft employee, who was planning to leave Microsoft to start a new Internet business with an idea he had. Mr. Facq was interested in the idea and decided to depart Microsoft and join Mr. Jain's new Internet and mobile technologies venture, InfoSpace, in February 1996.

Mr. Facq and Mr. Jain were the two initial founding employees of InfoSpace. Mr. Facq was responsible for the technical aspects of InfoSpace. Mr. Facq created, developed, maintained, and modified the software and technology InfoSpace used to generate revenues. For example, Mr. Facq developed and wrote the Web server, ad server, and user manager service programs. Mr. Jain, on the other hand, handled the administrative side of the business. Mr. Jain served as President and administrative head of InfoSpace, allowing Mr. Facq to focus on the technical aspects required to make InfoSpace successful. Mr. Facq's roles included Chief Technical Officer, Senior Software Design Engineer, and Chief Systems Architect.

The Options

Mr. Facq initially accepted a salary of $45,000 per year from InfoSpace. In exchange for Mr. Facq's agreement to work for a relatively modest base salary, InfoSpace also granted Mr. Facq options to purchase stock in InfoSpace. InfoSpace first gave Mr. Facq options to purchase 100,000 shares of InfoSpace stock for $0.01 per share. InfoSpace increased this offer in April 1996 and granted Mr. Facq options to purchase 300,000 shares of stock for $0.01 per share. These options vested over a 4-year period and were exercisable in full after April 10, 2000, if Mr. Facq continued to work at InfoSpace. These options were granted pursuant to a nonqualified stock option agreement, which Mr. Facq signed in 1998. Mrs. Facq also signed a consent of spouse in 1998.

InfoSpace debuted its stock to the public in an initial public offering (IPO) on December 15, 1998. InfoSpace employees, including Mr. Facq, could not exercise their options for the first 6 months after the IPO. Mr. Facq and the other option holder employees watched the value of the stock climb slowly, counter to their expectations that the stock would rapidly rise.

In anticipation of the stock's value increasing, Mr. Facq prepared to exercise his options. He signed a margin account agreement with Hambrecht and Quist in February 1999. This agreement enabled Mr. Facq to borrow money to exercise his InfoSpace options. He could use the loan proceeds to pay the exercise price and the amount required to be withheld in taxes.

Mr. Facq's margin account was secured by the shares he would receive, to be held in the margin account. If the value of the shares in the margin account decreased below a certain level, Hambrecht and Quist was authorized (pursuant to the Margin Loan Agreement, and NASD and SEC rules) to sell the shares to repay the amount Mr. Facq owed. Mr. Facq was personally liable for repayment of any shortfall.

In 2000, Mr. Facq used his Hambrecht and Quist account on several occasions to borrow money to exercise the options.[6] Mr. Facq's purchases in 2000 are shown in the table below, which also indicates the exercise prices and the amount of withholding taxes for each purchase funded through the margin account.

| Purchase Date | Shares Purchased | Exercise Price | Tax Withholding | Market Value of Shares |
|---|---|---|---|---|
| Feb. 7, 2000 | 56,000 | $140 | $1,289,589.25 | $4,364,500.00 |
| Feb. 15, 2000 | 144,000 | 360 | 4,252,621.23 | 14,440,500.00 |
| Mar. 7, 2000 | 100,000 | 500 | 7,718,382.64 | 18,870,429.60 |
| Apr. 17, 2000 | 200,000 | 500 | 2,650,352.75 | 9,000,000.00 |
| May 24, 2000 | 200,000 | 500 | 2,723,977.75 | 9,250,000.00 |
| July 28, 2000 | 50,000 | 93,750 | -- | 1,593,750.00 |

---

[6]The number of shares Mr. Facq purchased is not consistent with the initial number of shares InfoSpace granted Mr. Facq because stock splits occurred between the grant of the options and when Mr. Facq exercised them.

Mr. Facq used his margin account not only to borrow the funds necessary to exercise his options but also to fund the payments of withholding taxes. He also used the margin account to borrow money to purchase other items in 1999 and 2000. For example, he purchased a Dodge Viper, a 53-foot boat, a Ferrari F50, a Lamborghini Diablo, a condominium in Whistler, British Columbia, Canada, a house in France for his parents, and a house in Woodinville, Washington.

Mr. Facq had title to his InfoSpace shares subject to the interest of Hambrecht and Quist securing the repayment of his loans. Mr. Facq had the right to vote the shares, to receive dividends with respect to the shares, and to pledge the shares as collateral. Mr. Facq generally kept the shares in his margin account and did not sell them immediately to pay the amount he owed to Hambrecht and Quist. He was confident in the success of the business he helped create and anticipated that the stock would continue to appreciate like many other Internet stocks of the time.

Unfortunately, the value of the stock declined significantly in mid-2000. As the value of the stock declined, Hambrecht and Quist issued Mr. Facq numerous margin calls on his account in July and August 2000. Mr. Facq had to either deposit funds in the account or Hambrecht and Quist would sell some of the InfoSpace stock to cover the outstanding debts. Mr. Facq accepted a $3 million loan from Mr. Jain and a $3 million loan from InfoSpace to pay down the margin debt he owed to Hambrecht

and Quist and help resolve his precarious financial situation. The loans from Mr. Jain and InfoSpace were secured by Mr. Facq's options and, in the case of the loan from Mr. Jain, Mr. Facq's InfoSpace shares.

Despite all the margin calls, Mr. Facq continued to purchase items using the account. Because the margin account lacked sufficient assets, Mr. Facq had to accept a $5 million loan from Mr. Jain to satisfy a contract he made to purchase a home on Mercer Island, Washington.

Mr. Facq also wanted to keep his shares in InfoSpace in case the stock rebounded. He tried to borrow from InfoSpace to pay down the margin loans so that the shares in his margin account would not be sold to satisfy his debt. This was to no avail, however. Mr. Facq transferred his account to Salomon Smith Barney in September 2000. In 2001, Salomon Smith Barney was forced to sell all the shares of InfoSpace that Mr. Facq owned to meet the margin requirements.

<u>Petitioners' Return</u>

Petitioners timely filed their Federal income tax return for 2000. Petitioners reported $46,414,655 of income for the year and tax due of $18,341,070, while the W-2, Wage and Tax Statement, from InfoSpace reported that Mr. Facq received $63,327,671.77 of income in 2000. Petitioners attached a Form 8275, Disclosure Statement, to their return that cited section 1.83-3(k), Income Tax Regs., to explain the approximate $16.9 million difference between the amount of gross income shown on

the W-2 versus the amount petitioners reported on their return. The disclosure statement stated that Mr. Facq's exercise of his options was not taxable because the shares he received were subject to a substantial risk of forfeiture and nontransferable.

Petitioners cited section 1.83-3(k), Income Tax Regs., and argued that the shares were subject to restrictions on transfer due to pooling of interest accounting rules. Petitioners have since conceded that no pooling restrictions applied that made Mr. Facq's shares subject to a substantial risk of forfeiture and nontransferable when he received them in 2000.

Mr. Facq is not educated in the tax laws of the United States and is not a lawyer or an accountant. He relied on his accountants, Sweeny Conrad, and his tax attorneys, Chicoine & Hallett, to prepare the return for 2000 and the accompanying disclosure statement.

Respondent examined petitioners' return for 2000 and issued petitioner a notice of deficiency (deficiency notice) dated December 22, 2004. Respondent determined in the deficiency notice that petitioners should have included in income the spread between the fair market value of the shares and the exercise price for the shares pursuant to section 83. Respondent accordingly determined that $25,047,304 was the correct tax liability, giving rise to a $6.7 million deficiency. Respondent also determined that petitioners were liable for the accuracy-related penalty. Petitioners timely filed a petition for review with this Court.

OPINION

I.    Receipt of Income on Exercise of Option

We are asked to decide whether petitioners received income when Mr. Facq exercised his options through a margin account in 2000.  Petitioners argue that exercising an option through a margin account is properly treated as the grant of another option to buy the shares and that petitioners were thus not taxable when Mr. Facq exercised his options.  Instead, petitioners were subject to tax when the shares were sold to pay the margin debt.

Petitioners' arguments are virtually identical to those decided in this Court, three District Courts, and the Court of Federal Claims.  See Hilen v. Commissioner, T.C. Memo. 2005-226, appeal docketed, No. 06-70290 (9th Cir., Jan. 19, 2006); Palahnuk v. United States, 70 Fed. Cl. 87 (2006); United States v. Tuff, 359 F. Supp. 2d 1129 (W.D. Wash. 2005), appeal docketed, No. 05-35195 (9th Cir., Mar. 7, 2005); Facq v. United States, 363 F. Supp. 2d 1288 (W.D. Wash. 2005), appeal docketed, No. 05-35124 (9th Cir., Feb. 8, 2005); Miller v. United States, 345 F. Supp. 2d 1046 (N.D. Cal. 2004), appeal docketed, No. 04-17470 (9th Cir., Feb. 7, 2005).  Respondent argues that the exception treating the exercise of an option as the grant of another option does not apply and that the income was properly reported when Mr. Facq exercised his options rather than when the shares were sold to pay off the margin debt.  We agree with respondent and with the holdings in the other cases.

We begin with the general rule of taxability of options to best understand petitioners' arguments.

A.   General Framework

When an employee receives a nonstatutory stock option[7] that does not have a readily ascertainable fair market value, the employee is not taxed on the receipt of the option at that time, although it is part of his or her compensation.  Sec. 83(e)(3). Instead, the employee is generally taxed when he or she exercises the option and receives shares, if the shares have been transferred to, and are substantially vested in, the employee. Sec. 83(a); Tanner v. Commissioner, 117 T.C. 237, 242 (2001), affd. 65 Fed. Appx. 508 (5th Cir. 2003); Hilen v. Commissioner, supra; sec. 1.83-3(a), Income Tax Regs.  The taxpayer must recognize income in the amount that the fair market value of the shares he or she receives exceeds the exercise price that he or she pays.  Sec. 83(a).

For the taxpayer to be taxed at the time he or she exercises the option and receives the shares, the shares must be transferred to and substantially vested in the employee.  Sec. 1.83-3(a), Income Tax Regs.  A transfer to the employee occurs when the employee acquires a beneficial ownership interest in the property.  Miller v. United States, supra at 1049; sec. 1.83-3(a), Income Tax Regs.  The shares are substantially vested in

---

[7]Statutory stock options are compensatory options that meet certain criteria and are treated differently under the Code.  See sec. 422.  Stock options that do not meet the requirements of statutory stock options are nonstatutory stock options.

the employee when the shares are either transferable or not subject to a substantial risk of forfeiture.  <u>Miller v. United States</u>, <u>supra</u>; sec. 1.83-3(b), Income Tax Regs.

The shares are subject to a substantial risk of forfeiture when the owner's rights to their full enjoyment are conditioned upon the future performance of substantial services by any individual.  Sec. 83(c)(1); <u>Miller v. United States</u>, <u>supra</u>; sec. 1.83-3(c)(1), Income Tax Regs.  Whether a risk of forfeiture is substantial depends on the facts and circumstances.  Sec. 1.83-3(c)(1), Income Tax Regs.  The shares are transferable only if a transferee's rights in the property are not subject to a substantial risk of forfeiture.  Sec. 83(c)(2); sec. 1.83-3(d), Income Tax Regs.  Property is transferable if the person receiving the property can sell, assign, and pledge his or her interest in the property to any person other than the transferor and if the transferee is not required to give up the property in the event a substantial risk of forfeiture materializes.  Sec. 1.83-3(d), Income Tax Regs.

B. <u>Application of Framework to Mr. Facq's Options</u>

Mr. Facq received nonstatutory stock options in 1996 and was not taxed then.  We must consider whether, instead, petitioners are taxed when Mr. Facq exercised his options and received InfoSpace shares in 2000.[8]

---

[8]There is no longer a dispute whether the InfoSpace shares were substantially vested in Mr. Facq when he exercised them in 2000.  Petitioners alleged in their petition that the shares were subject to a substantial risk of forfeiture and nontransferable
(continued...)

The parties dispute whether there was a transfer of the shares to Mr. Facq when Mr. Facq exercised his options. Mr. Facq acquired beneficial ownership of the shares when he exercised his options in 2000. He obtained legal title to the shares. He was entitled to receive dividends, vote the shares, and pledge the shares as collateral. Mr. Facq's rights were subject only to Hambrecht and Quist's interest as the margin account provider. See sec. 1.83-3(a), Income Tax Regs.

Without considering any exceptions, the shares would be treated as transferred and thus taxable to Mr. Facq under the general rule when he exercised his options because he acquired beneficial ownership of the InfoSpace shares. See Miller v. United States, supra at 1050. Accordingly, the shares would be taxable when Mr. Facq exercised his options in 2000. Petitioners argue, however, that we should not treat the shares as transferred to Mr. Facq, because an exception to this general rule applies. If petitioners are correct that the exception applies, there would be no transfer and Mr. Facq would not be subject to tax in 2000. See sec. 83(a).

---

[8](...continued)
because the shares were subject to transfer restrictions under the pooling of interest accounting rules, but have since conceded this issue. Petitioners also alleged in their petition that the shares were subject to a substantial risk of forfeiture and nontransferable because Mr. Facq was subject to liability under sec. 16(b) of the Securities Exchange Act of 1934, but they have conceded this as well. See sec. 83(c). Petitioners raise no other arguments that the shares were not substantially vested in Mr. Facq in 2000.

C.    Exception Treating Certain Transfers as the Grant of an Option

An exception to the general rule treats certain exercises of options and receipts of shares as the grant of another option instead of a transfer of shares.  Sec. 1.83-3(a)(2), Income Tax Regs.  The exception treats the transaction as another option where the amount paid for the exercise is a debt secured by the shares on which there is no personal liability.  Id.  Whether a transaction is viewed in substance as the grant of an option rather than a transfer depends on the facts and circumstances. Id.  This analysis includes factors such as the type of property involved, the extent to which the risk the property will decline in value has been transferred, and the likelihood that the purchase price will be paid.  Id.

Petitioners argue that their situation is the same as that described in section 1.83-3(a)(7), Example (2), Income Tax Regs. (Example 2), where an employee pays his or her employer for shares by giving the employer a note for the purchase price on which the employee has no personal liability.  See sec. 1.83-3(a)(7), Example (2), Income Tax Regs.  Petitioners contend that because the employee in Example 2 is treated as having received an option, petitioners should also be treated as having received an option.

Petitioners argue the key factor to be considered is whether an employee has capital at risk.  If the employee has no capital at risk, they argue, the transaction is in substance the grant of an option regardless of whether the debt is to the employer or to

a margin account provider.  According to petitioners, Congress intended to deny capital gains treatment to those who do not make any capital investment in their options.  See Palahnuk v. United States, 70 Fed. Cl. at 92.  In keeping with their argument, petitioners note that Mr. Facq exercised his options using a loan from Hambrecht and Quist and therefore Mr. Facq had no capital at risk.  Accordingly, petitioners argue, no transfer occurred until Hambrecht and Quist sold the stock to satisfy the margin calls on Mr. Facq's account.

We disagree with petitioners' position.  Example 2's focus is on what the employer transferred or received in exchange, not on what the employee has at risk.[9]  Palahnuk v. United States, supra.  Example 2 describes an alternative method of providing an employee an option to purchase property.  Palahnuk v. United States, supra; sec. 1.83-3(a)(7), Example (2), Income Tax Regs.  Rather than grant the employee an option, the employer makes stock available to the employee in exchange for a note.  Sec. 1.83-3(a)(7), Example (2), Income Tax Regs.  Although the transaction is referred to as a sale, in reality the employee has received an option.  Id.  The employee may acquire the stock later if the employee chooses by paying the note.  Palahnuk v. Commissioner, supra; sec. 1.83-3(a)(7), Example (2), Income Tax Regs.

---

[9]In fact, options with a readily ascertainable fair market value are taxed at the time of grant, when the employee has no capital at risk.  Sec. 83(e)(3), (4); Palahnuk v. United States, 70 Fed. Cl. 87, 93 (2006).

Petitioners ignore a key feature of Example 2: there, it is not certain whether the employee will pay the debt to the employer (i.e., exercise the employee's option to purchase the stock). Palahnuk v. United States, supra. Unlike Example 2, it was certain when Mr. Facq exercised his options that InfoSpace would receive the cash in full satisfaction of the exercise price. Mr. Facq borrowed money from Hambrecht and Quist, not InfoSpace, to exercise his options. If he failed to pay the loan, the shares would be (and eventually were) forfeited to the margin account provider, who would sell the shares. Mr. Facq's shares in InfoSpace would not go back to InfoSpace regardless of what Mr. Facq did. See Palahnuk v. United States, supra. The transaction at issue in this case is therefore not similar to the transaction described in Example 2. See Hilen v. Commissioner, T.C. Memo. 2005-226; Palahnuk v. United States, supra; sec. 1.83-3(a)(7), Example (2), Income Tax Regs.

Moreover, the transaction at issue here is not in substance the same as a grant of an option. See Hilen v. Commissioner, supra; sec. 1.83-3(a)(2), Income Tax Regs. As noted previously, we, as well as three District Courts and the Court of Federal Claims, have since found that the purchase of stock with third-party margin debt under similar circumstances is not in substance the same as the grant of an option. Hilen v. Commissioner, supra; Palahnuk v. United States, supra; United States v. Tuff, 359 F. Supp. 2d 1129 (W.D. Wash. 2005); Facq v. United States, 363 F. Supp. 2d 1288 (W.D. Wash. 2005); Miller v. United States,

345 F. Supp. 2d at 1046.  In particular, the District Court for the Western District of Washington decided this same issue with respect to Mr. Facq's refund action for 1999.  Facq v. United States, supra.  We agree with the analyses of the three factors[10] and the holdings in these opinions and find that Mr. Facq's transaction was not in substance the same as the grant of an option.

We now analyze the three factors.  First, the type of property involved is publicly traded shares of stock.  Mr. Facq had title to the shares (subject to the interest of Hambrecht and Quist because the shares were in the margin account), and had the right to receive dividends, to vote the shares, and to pledge the shares.  In fact, Mr. Facq did pledge the shares to Hambrecht and Quist as collateral for the margin loans.  This factor weighs against finding that the transaction is, in substance, similar to the grant of an option.  See Hilen v. Commissioner, supra; Palahnuk v. United States, supra; Miller v. United States, supra at 1050-1051.

We next consider whether the risk that the property will decline in value has been transferred.  Sec. 1.83-3(a)(2), Income Tax Regs.  Petitioners argue that we should concentrate on whether Mr. Facq was personally liable for the margin loans.  They argue that he was not because Hambrecht and Quist required

_____

[10]The factors to be considered include the type of property involved, the extent to which the risk that the property will decline in value has been transferred and the likelihood the purchase price will be paid.  Sec. 1.83-3(a)(2), Income Tax Regs.

Mr. Facq to keep a certain value in the margin account, and if the value of the shares declined below that specified value, Mr. Facq would have to deposit additional assets or the shares would be sold.[11]  We disagree with petitioner's interpretation of the risk transfer factor.  The proper inquiry is not whether the taxpayer was personally liable, but whether the risk of a decline in value of the shares was transferred from the employer.  Palahnuk v. United States, 70 Fed. Cl. at 93.  When InfoSpace transferred the shares, it no longer bore the risk of a decline in value.  Either Hambrecht and Quist or Mr. Facq bore that risk.  We need not determine whether it was Hambrecht and Quist or Mr. Facq; either way, InfoSpace no longer had the risk.[12]  Palahnuk v. United States, supra; Facq v. United States, supra.  Accordingly, this factor weighs against finding that the substance of the transaction was the same as the grant of an option.  Palahnuk v. United States, supra.

---

[11]Petitioners also encourage us to consider sec. 465 in determining whether Mr. Facq was personally liable to Hambrecht and Quist for the margin loan.  We decline to consider sec. 465 in this context because that section pertains to deductions.  Facq v. United States, 363 F. Supp. 2d 1288, 1290-1291 (W.D. Wa. 2005); United States v. Tuff, 359 F. Supp. 2d 1129, 1135-1136 (W.D. Wa. 2005); Miller v. United States, 345 F. Supp. 2d 1046, 1051 (N.D. Cal. 2004).

[12]We note that Mr. Facq did bear some risk that the value of the InfoSpace shares would decline.  If the balance in his margin account declined, Mr. Facq would have to take steps to retain his shares.  He would have to deposit additional assets or the stock would be sold.  These facts indicate that Mr. Facq bore some risk that the value of the stock would decline.  See Hilen v. Commissioner, T.C. Memo. 2005-226; Facq v. United States, supra; Miller v. United States, supra.

We finally consider the likelihood the purchase price will be paid.  Sec. 1.83-3(a)(2), Income Tax Regs.  This factor examines whether the purchase price for the property is paid, not whether the indebtedness incurred to pay the purchase price will be paid.  Hilen v. Commissioner, supra; Facq v. United States, supra; Miller v. United States, supra.  InfoSpace received the exercise price of the shares (plus amounts from Mr. Facq's margin account to fund the tax withholding payments) when Mr. Facq exercised his options.  Accordingly, this factor also weighs against finding that the substance of the transaction was the same as the grant of an option.  Hilen v. Commissioner, supra.

In summary, the facts and circumstances, including the three specified factors, indicate that in substance, Mr. Facq's use of his margin account to exercise his options to buy InfoSpace stock was not the same as the grant of an option.  See Hilen v. Commissioner, supra; Palahnuk v. United States, supra; Facq v. United States, supra; Miller v. United States, supra.

We therefore find that a transfer of stock occurred under section 83 when Mr. Facq exercised his stock options in 2000 and that the exception treating some transfers as grants of options does not apply to this case.  We accordingly sustain respondent's determination that Mr. Facq received income in 2000 when he exercised his options.

We next consider whether petitioners are liable for the accuracy-related penalty.

## II.  Accuracy-Related Penalty

Respondent determined that petitioners are liable for the accuracy-related penalty due to negligence or disregard of rules and regulations.[13]  See sec. 6662(b)(1).  Respondent alternatively determined that petitioners were liable for the accuracy-related penalty because they substantially understated their tax.[14]  See sec. 6662(b)(2).

We note that this is the first time the Commissioner is asserting the penalty in cases involving stock purchased through a margin account.  Hilen v. Commissioner, T.C. Memo. 2005-226; Facq v. United States, 363 F. Supp. 2d 1288 (W.D. Wash. 2005); Miller v. United States, 345 F. Supp. 2d 1046 (N.D. Cal. 2004); Palahnuk v. United States, supra.

While respondent bears the initial burden of production as to the accuracy-related penalty and must come forward with sufficient evidence that it is appropriate to impose the penalty, the taxpayer bears the burden of proof as to any exception to the accuracy-related penalty.  See sec. 7491(c); Rule 142(a); Higbee v. Commissioner, 116 T.C. 438, 446-447 (2001).  One such

---

[13]Negligence is the lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the same circumstances.  Neely v. Commissioner, 85 T.C. 934 (1985).  Disregard is characterized as any careless, reckless, or intentional disregard.  Sec. 6662(c); sec. 1.6662-3(b)(1) and (2), Income Tax Regs.

[14]There is a substantial understatement of tax if the amount of the understatement exceeds the greater of either 10 percent of the tax required to be shown on the return, or $5,000.  Sec. 6662(a), (b)(1) and (2), (d)(1)(A); sec. 1.6662-4(a) and (b)(1), Income Tax Regs.

exception to the accuracy-related penalty applies to any portion of an underpayment if the taxpayer can prove that there was reasonable cause for the taxpayer's position and that the taxpayer acted in good faith with respect to that portion. Sec. 6664(c)(1); sec. 1.6664-4(b), Income Tax Regs.

The determination of whether a taxpayer acted with reasonable cause and in good faith depends on the pertinent facts and circumstances, including the taxpayer's efforts to assess his or her proper tax liability, the knowledge and experience of the taxpayer, and the reliance on the advice of a professional. Sec. 1.6664-4(b)(1), Income Tax Regs. When a taxpayer selects a competent tax adviser and supplies him or her with all relevant information, it is consistent with ordinary business care and prudence to rely upon the adviser's professional judgment as to the taxpayer's tax obligations. United States v. Boyle, 469 U.S. 241, 250-251 (1985). Moreover, a taxpayer who seeks the advice of an adviser does not have to challenge the adviser's conclusions, seek a second opinion, or try to check the advice by reviewing the tax code himself or herself. Id.

Mr. Facq knew he was not educated in United States tax law and decided to seek professional assistance in preparing petitioners' returns. He retained tax attorneys, Chicoine & Hallett, and accountants, Sweeny Conrad, and relied upon them to accurately and properly prepare a return for 2000. We find nothing in the record to indicate that it was unreasonable for Mr. Facq to accept the advice of his advisers and not to seek a

second opinion.  See id. (such a requirement would nullify the purpose of seeking the advice of an expert in the first place).

Furthermore, the cases on whether a taxpayer realized gain on the stock purchased with third-party margin debt had yet to be litigated at the time petitioners filed the return for 2000.

There was therefore no definitive authority to guide petitioners on whether they could exclude approximately $16.9 million of gain from stock acquired with third-party margin debt.  Because the issue, at the time they filed their return, was novel, we find that petitioners had reasonable cause and acted in good faith in excluding the gain when they filed their return.  See Williams v. Commissioner, 123 T.C. 144 (2004) (declining to impose a penalty involving issue of first impression and the interrelationship between complex tax and bankruptcy laws).  We do not find subsequent adverse caselaw to be relevant in considering whether petitioners had reasonable cause and acted in good faith with respect to the understatement when they filed their return.[15]

We find, therefore, that petitioners have carried their burden that they had reasonable cause and acted in good faith to

---

[15]The mere fact that we held against petitioners on the substantive issue does not, in and of itself, require holding for respondent on the penalty.  See Hitchins v. Commissioner, 103 T.C. 711, 719-720 (1994) ("Indeed, we have specifically refused to impose * * * [a penalty] where it appeared that the issue was one not previously considered by the Court and the statutory language was not entirely clear.").

exclude the gain of approximately $16.9 million at the time they filed their return.[16]

Conclusion

After careful consideration of the facts and circumstances of this case, we sustain respondent's deficiency determination but find that petitioners are not liable for the accuracy-related penalty under section 6662(a).

To reflect the foregoing,

<u>An order and decision will be entered for respondent as to the deficiency but for petitioners as to the penalty</u>.

---

[16]Petitioners also urged us to conclude that the penalty portion of the deficiency notice was null and void because respondent "automatically" asserted the accuracy-related penalty without first considering whether any exceptions applied. Petitioners, therefore, are essentially asking us to peer behind the deficiency notice, which we generally do not do and will not do in this case. See <u>Scar v. Commissioner</u>, 814 F.2d 1363, 1368 (9th Cir. 1987), revg. 81 T.C. 855 (1983); <u>Edwards v. Commissioner</u>, T.C. Memo. 2002-169, affd. on unrelated issue 119 Fed. Appx. 293 (D.C. Cir. 2005); <u>Corcoran v. Commissioner</u>, T.C. Memo. 2002-18 (and cases cited therein), affd. 54 Fed. Appx. 254 (9th Cir., 2002). Specifically, petitioners' reliance on <u>Scar</u>, is misplaced. <u>Scar</u> explicitly states that the Commissioner need not explain how the determinations were made. This Court and the Court of Appeals, for the Ninth Circuit have limited the invalidation of a deficiency notice under <u>Scar</u> to circumstances where the deficiency notice reveals on its face that the Commissioner failed to make a determination. See <u>Clapp v. Commissioner</u>, 875 F.2d 1396, 1402 (9th Cir. 1989); <u>Campbell v. Commissioner</u>, 90 T.C. 110 (1988); <u>Edwards v. Commissioner</u>, <u>supra</u>.