T.C. Memo. 2015-123

UNITED STATES TAX COURT

QINETIQ U.S. HOLDINGS, INC. & SUBSIDIARIES, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 14122-13.                    Filed July 2, 2015.

<u>Gerald A. Kafka</u> and <u>Sean M. Akins</u>, for petitioner.

<u>Linda P. Azmon</u> and <u>Marie E. Small</u>, for respondent.

MEMORANDUM OPINION

GOEKE, <u>Judge</u>:  Respondent determined a deficiency in QinetiQ U.S.

Holdings, Inc. & Subsidiaries' (petitioner) Federal income tax of $13,902,087 for

the taxable year ended (TYE) March 31, 2009, due to a disallowance of a portion

of petitioner's claimed deduction for salary and wage compensation pursuant to

[*2] section 83.[1]  The disallowance relates to class A and class B shares of stock issued by Dominion Technology Resources, Inc. (DTRI), to Thomas G. Hume and Julian Chin in 2002.[2]  However, petitioner conceded that the portion of the adjustment attributable to the class A shares of stock of DTRI subscribed to by Hume was not subject to a substantial risk of forfeiture within the meaning of section 1.83-3(c)(3), Income Tax Regs.  Accordingly, petitioner disputes only the portion of the adjustment attributable to the class A and class B shares of stock of DTRI subscribed to by Chin in 2002 (Chin stock).[3]

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the year at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[2]In addition to disallowing the $117,777,501 deduction petitioner claimed for salaries and wages under sec. 83, the notice of deficiency determined the following:  (1) petitioner is not entitled to a deduction in regard to Apogen restricted stock; (2) the deduction petitioner claimed for amortization expenses is reduced by $111,498; (3) because of other adjustments in the notice, the amount applied to M-3 under sec. 163(j) is recomputed; and (4) the amount petitioner can deduct under sec. 199 is increased by $2,007,202.  Petitioner does not dispute the Apogen restricted stock adjustment or the amortization adjustment.  However, petitioner disputes that it is not entitled to the sec. 163(j) applied M-3 adjustment and the sec. 199 adjustment.  These issues are correlative and depend upon whether respondent's disallowance of petitioner's claimed sec. 83 deduction is sustained in part or in full.  Therefore, these issues are not before this Court.

[3]Petitioner also filed protective claims to carry back a portion of net operating losses to Forms 1120, U.S. Corporation Income Tax Return, filed by DTRI for TYE December 31, 2007 and 2008.  However, these claims are not

(continued...)

[*3]  The issue presented for our decision is whether petitioner is entitled to a deduction, pursuant to section 83, for salary and wage compensation paid in connection with the Chin stock for petitioner's TYE March 31, 2009.  We hold that petitioner is not entitled to the deduction under section 83.[4]

## Background

Petitioner timely filed a petition with this Court for redetermination of the deficiency for TYE March 31, 2009.  The parties simultaneously filed a Joint Submission of Case Without Trial pursuant to Tax Court Rule 122.  Certain facts in evidence have been stipulated and are so found.  The parties' stipulations of facts and the accompanying exhibits are incorporated herein by this reference.  When petitioner filed the petition, its principal place of business was in Reston, Virginia.  Petitioner is engaged in the defense, aerospace, and security business.

I.    Incorporation of DTRI

On March 13, 2002, Hume incorporated Thomas G. Hume, Inc. (TGH), under the laws of the Commonwealth of Virginia to provide Government

---

[3](...continued)
before this Court.

[4]As a result of this holding, we do not address respondent's duty of consistency affirmative defense.

[*4] contracting services.  Hume and Karyn Hume, Hume's wife, served as the initial directors of TGH.

At the time of incorporation, TGH was authorized to issue 5,000 shares of common stock with a par value of 10 cents per share.  Although authorized to do so, TGH did not issue certificates for shares of stock nor offer to sell or issue shares of stock at the time of its incorporation.  On March 26, 2002, on Form 2553, Election by a Small Business Corporation, Hume elected for TGH to be treated as an S corporation under section 1362(a), indicating that he was the sole shareholder of TGH.  The Internal Revenue Service approved the S corporation election on April 6, 2002.

In November 2002 Hume and Chin engaged in discussions regarding Chin's joining the business enterprise.  The law firm that represented Hume sent him a memorandum on November 27, 2002, listing certain action items, including: amending the name of the corporation, amending the articles of incorporation, and authorizing new shares of stock.  On December 6, 2002, Hume and Karyn Hume, as directors of TGH, filed articles of amendment with the Commonwealth of Virginia changing the name of TGH to DTRI.  The articles of amendment also authorized an increase in the common stock of DTRI from 5,000 to 20,000 shares and divided the shares into two classes:  15,000 shares of class A voting and 5,000

[*5] shares of class B nonvoting stock.[5]  On December 7, 2002, Karyn Hume resigned from DTRI's board of directors, leaving Hume as the sole director. Hume was also employed as the president and chief executive officer of DTRI while Chin was employed as its executive vice president and chief operating officer.

On December 9, 2002, DTRI deposited $1,000 into a bank account at Cardinal Bank, N.A.  Hume provided $450 as par value consideration for 4,500 shares of DTRI class A common voting stock.  Chin provided $450 as par value consideration for 4,455 shares of DTRI class A common voting stock and 45 shares of DTRI class B common nonvoting stock.

II.     Consents, Agreements, and Bylaws

A.     December 12 Consent

On December 12, 2002, Hume, in his capacity as director of DTRI, executed a "Consent in Lieu of the Organizational Meeting of the Board of Directors of DTRI" (consent), which stated that the board wished to offer for sale and issue shares of class A and class B common stock of DTRI.  Attached to the consent were copies of letters signed by Hume and Chin acknowledging that they were

---

[5]The class A stock was subject to a 100-for-1 stock split effective January 15, 2004, and a 5-for-1 stock split effective December 22, 2005.

[*6] willing to subscribe to the number of shares of common stock for which they had paid on December 9, 2002, and representing that the stock was purchased for "investment and not for the purpose of distribution or resale." The consent authorized DTRI to enter into both an employment agreement and a shareholders agreement with each of Hume and Chin in the future. The consent also authorized DTRI to enter into an employment agreement and a restrictive stock agreement with each of Thomas E. Bove, Richard L. White, and Gordon G. Hastings at a later date. The consent did not specify a time for entering into either an employment agreement or a shareholders agreement. Nor did the consent contain any provisions regarding forfeiture of the previously issued stock in the event that either Hume or Chin failed to enter into either an employment agreement or a shareholders agreement.

B.    Shareholders Agreement

Hume and Chin each entered into a shareholders agreement with DTRI on December 18, 2002. The shareholders agreement stated that "the Corporation has nine thousand (9,000) shares of common stock issued and outstanding." The shareholders agreement also stated that "Hume and Chin each own the number of shares of common stock of the Corporation, all stock being fully paid and non-assessable, as is set out beside their names". The shareholders agreement defined

[*7] "stock" as "all of the interest of each of the Shareholders in all of the issued and outstanding common stock of the Corporation." The shareholders agreement contained provisions with respect to Hume's and Chin's ability to voluntarily transfer the class A and class B shares of stock either as gifts or for value with prior notice and consent of DTRI and the other shareholders.

> The shareholders agreement stated that Hume and Chin
>
> believe that it is in their mutual best interest to make provisions for the future disposition of all of the shares of common stock of the Corporation to the end that continuity of harmonious management is assured, and a fair process is established by which said shares of common stock may be transferred, conveyed, assigned or sold.

Additionally, the shareholders agreement stated that "[t]he parties desire to limit the ownership of the Stock to Shareholders who are employees of the Corporation" and further stated that a shareholder who "terminates his employment with the Corporation with or without cause, or whose employment with the Corporation is terminated by the Corporation with or without cause, shall be deemed to have offered to sell all of his Stock to the Corporation for the Agreement price". The "Agreement price" to be paid to a deceased or terminating shareholder was set forth in the shareholders agreement as follows:

> 7.1 Voluntary Termination of Employment without Competition: In the event that a Shareholder voluntarily terminates his employment and does not engage in Competition, then the Agreement Price shall

**[*8]** be determined by reducing the Agreement Value by five percent (5%) for every full year of service by the Terminating Shareholder as an employee of the Corporation less than twenty (20) years. For example, if the Terminating Shareholder voluntarily terminates his employment after seventeen full years of service and does not engage in Competition, the Agreement Price will be eighty five percent (85%) [100% minus 15%] of the Agreement Value.

7.2 Voluntary Termination of Employment with Competition; Termination of Employment With Cause By the Corporation: In the event that a Shareholder voluntarily terminates his employment and engages in Competition or is terminated by the Corporation for cause, the Agreement Price shall be (i) The Agreement Price calculated as set forth in paragraph 7.1; or (ii) twenty five percent (25%) of the Agreement Value, whichever is less.

7.3 Disability; Termination of Employment Without Cause By the Corporation: In the event of the Disability of a Shareholder or the termination of the employment of a Shareholder by the Corporation without cause, the Agreement price shall be one hundred percent (100%) the Agreement Value.

The shareholders agreement also required that any "change, alteration, or modification" be "in writing and signed by all of the parties hereto."

C.    Employment Agreements and Stock Agreements

On December 18, 2002, Hume and Chin separately entered into employment agreements with DTRI. The employment agreements stated:

This Agreement contains the entire understanding of the parties with respect to the subject matter hereof. All prior promises, understandings or agreements are merged herein. It may not be changed orally, but only by an agreement in writing, signed by the

**[\*9]** party against whom enforcement of any waiver, change, modification or discharge is sought.

The employment agreements did not contain a provision regarding the transfer of any stock to Hume or Chin in connection with their performance of services for DTRI or any other entity. Also on December 18, 2002, Hume and Chin executed the original stock certificates. The original stock certificates bore a legend that stated: "The sale and/or transfer of this stock is restricted in accordance with the provisions of a Shareholders Agreement dated effective the ___ day of _____, 2002, a copy of which is filed in the corporate book." DTRI did not enter into restrictive stock agreements with Hume or Chin relating to the ownership of the class A and class B shares of stock transferred on December 18, 2002.

Between December 2002 and January 2004, DTRI entered into employment agreements and restrictive stock agreements with White, Hastings, Bove, Edouard Granstedt, and Wesley E. McDonald, Jr. In consideration of the covenants and undertakings of the employees as stated in their respective employment agreements, and subject to their execution of restrictive stock agreements, DTRI granted shares of Class B common stock to each employee. Each employment agreement explicitly stated the number of shares of class B common stock granted to the employee in consideration of his employment. Each of the stock grants

**[*10]** vested annually over five years beginning one year after the grant date. The restrictive stock agreements set forth various terms and conditions relating to the ownership of stock, including: the requirement that shareholders give DTRI written notice of any intention to transfer the class B common stock for value; DTRI's rights of first refusal; and DTRI's right to repurchase stock at a predetermined purchase price upon the occurrence of certain triggering events.

Between December 2005 and December 2007, DTRI granted shares of restricted class B common stock to certain key employees at no cost to the employees. Each of the restricted stock grants vested annually over five years beginning one year after the grant date. The restricted stock was subject to restrictions imposed pursuant to a restrictive stock agreement between DTRI and the employee receiving the class B common stock. On December 31, 2007, DTRI granted each of Hume and Chin 275,000 shares of DTRI's class B common stock, subject to terms and restrictions set forth in restricted stock grants. Chin's restricted stock grant explicitly stated that "[t]he shares of Granted Stock acquired by you under this restricted stock grant will vest so long as you remain an employee of DTRI." Chin's restricted stock grant also included the following restrictions:

[*11] (i) Prior to Vesting.  Prior to the vesting of the Granted Stock * * * you will have no rights as a shareholder of DTRI.  All shares of Granted Stock that have not yet vested shall be held by DTRI in the form of non-certificated shares until they are fully vested or, in the event that your employment terminates prior to vesting, such Granted Stock shall be cancelled on the books of DTRI.

(ii) After Vesting.  Subject to the provisions hereof and to the provisions of the Restrictive Stock Agreement, after vesting of the Granted Stock * * * you will have all of the rights of a stockholder of Class B stock with respect to all of the Granted Stock, including the right to receive a certificate reflecting your ownership of the shares and all dividends or other distributions with respect to such Granted Stock.  In connection with the payment of such dividends or other distributions, DTRI will be entitled to deduct any taxes or other amounts required by any governmental authority to be withheld and paid over to such authority for your account.  As soon as practicable after the vesting of the Granted Stock * * * DTRI will release the certificate(s) representing such Granted Stock to you subject to the terms of the Restrictive Stock Agreement.

D.    Bylaws

The bylaws of DTRI provided that "certificates representing shares of the corporation shall be issued to every shareholder for the fully paid shares owned by him in such form as the Board of Directors shall determine."  The bylaws also provided that "[t]he shareholders may restrict the transfer of stock between themselves through written agreement."  Finally, the bylaws state that shareholders

> cannot dispose of their shares in the corporation otherwise than by gift, bequest, or intestacy or to a trust for the benefit of the

[*12] shareholder, or spouse or lineal descendants, without first giving the corporation and all other shareholders written notice of their intention to make such disposition, and further providing DTRI and its shareholders with a right of first refusal.

III.    DTRI's Federal Tax Filings

DTRI filed Forms 1120S, U.S. Income Tax Return for an S Corporation, that allocated income and losses to Hume, Chin, and other shareholders according to DTRI stock ownership for TYE December 31, 2002 through 2006.  DTRI also issued yearly Schedules K-1, Shareholder's Share of Income, Deductions, Credits, etc., that reported the distributable share of income and losses to DTRI shareholders, including Hume and Chin, according to their percentages of DTRI stock ownership for TYE December 31, 2002 through 2006.

Respondent did not assess Federal income tax against DTRI for TYE December 31, 2002 through 2006, because DTRI elected to be treated as a pass-through entity.  However, respondent timely assessed Federal income tax against each of DTRI's shareholders individually, including Hume and Chin, for TYE December 31, 2002 through 2006.  DTRI did not report the value of any portion of the stock at issue as wages for Federal employment tax purposes during TYE December 31, 2002 through 2007, and paid no employment taxes thereon.

**[\*13]** IV.   DTRI's Revocation of S Corporation Election

By letter dated December 8, 2006, DTRI revoked its S corporation election effective January 1, 2007.  On or about March 14, 2008, DTRI filed its Form 1120 for TYE December 31, 2007.  On June 19, 2008, DTRI filed with respondent a request for a private letter ruling, seeking relief from an inadvertent termination of its S corporation status under section 1362(f).  On December 15, 2008, respondent issued a private letter ruling concluding that if the erroneous failure to treat the class B Restricted stock as outstanding stock of DTRI caused its S election to terminate, the termination was an inadvertent termination and DTRI would be treated as continuing to be an S corporation from March 13, 2002, through January 1, 2007.

V.   2008 Execution of the Agreement and Plan of Merger

By letter dated January 3, 2008, petitioner proposed to DTRI the terms of a nonbinding agreement for the sale of DTRI to petitioner for a purchase price in the range of $70 million to $80 million.  Petitioner increased its proposal to a purchase price in the range of $85 million to $100 million, followed by an aggregate purchase price of $115 million.  On August 4, 2008, petitioner, Project Black Acquisition Corp., DTRI, Hume, and Chin entered into a final agreement and plan of merger wherein petitioner paid $123 million as merger consideration.  The

**[\*14]** merger transaction closed on October 17, 2008, with petitioner acquiring all of the outstanding shares of DTRI.

On September 3, 2008, Hume, in his capacity as both Director and shareholder of DTRI, Chin as shareholder, and Brian D. Hume as trustee for the Thomas G. Hume Irrevocable Trust as shareholder, executed a "Consent in Lieu of a Special Meeting of the Voting Shareholders of DTRI" (September 3 consent). The September 3 consent stated that certain shares of DTRI stock held by employees were subject to the shareholders agreement or restrictive stock agreements that provide for a redemption option or obligation with respect to such stock on the part of DTRI at a price that was less than the fair market value of the stock in the event that the employee's employment with DTRI terminated in certain instances. The September 3 consent also stated that the redemption option or obligation constituted a substantial risk of forfeiture within the meaning of section 83.

On October 17, 2008, Hume, as director of DTRI, executed a "Consent in Lieu of a Special Meeting of the Board of Directors of DTRI" (first October 17 consent) that stated that DTRI had entered into an agreement and plan of merger with petitioner and Project Black Acquisition Corp. for the exchange of all issued and outstanding shares of class A and class B common stock of DTRI for cash.

[*15] The first October 17 consent waived all of DTRI's rights with respect to the stock transfer restrictions effective immediately before the closing of the transaction.

Also on October 17, 2008, all of the shareholders of class A common stock of DTRI executed a "Consent in Lieu of the Organizational Meeting of the Board of Directors of DTRI" (second October 17 consent). The second October 17 consent authorized the waiver of the class A shareholders' rights with respect to the stock transfer restrictions effective immediately before the closing of the transaction.

A third "Consent in Lieu of the Organizational Meeting of the Board of Directors of DTRI" was executed on October 17, 2008 (third October 17 consent). The third October 17 consent stated that certain employees of DTRI had been granted class B restricted common stock that remained only partially vested. It further stated that those shares were to be vested immediately before the closing of the transaction.

VI.    Hume's and Chin's Federal Tax Filings

Hume and Chin filed Federal income tax returns for TYE December 31, 2002 through 2006, reporting allocations and distributions of profits and losses. For TYE December 31, 2008, Hume and Chin reported as ordinary income on

[*16] their Federal income tax returns their respective shares of the $117,777,501

of wage income at issue consistent with petitioner's reported wage and

compensation deduction. By letter dated January 19, 2012, Hume and Chin filed

protective refund claims for the 2008 taxable year as a result of respondent's

proposed disallowance of petitioner's claimed salary and wage deduction at issue.

The protective refund claims assert that the $117,777,501 received by Hume and

Chin was long-term capital gain rather than ordinary income from wages. The

protective refund claims, if allowed, would result in overpayments of Federal

income tax for Hume and Chin of $11,011,381 and $11,259,241, respectively.

> The parties stipulated the following:

> [i]f called to testify, Hume and Chin would testify that, during the
> period beginning in December 2002 until the merger of DTRI with
> petitioner in August 2008 ("the pre-merger period"), their ownership
> interests in the Class A and Class B stock of DTRI subscribed to in
> December 2002, is consistent with representations made by DTRI,
> Hume and Chin of outstanding ownership in such stock on all Federal
> tax filings made by DTRI, Hume and Chin during the pre-merger
> period.

## Discussion

Petitioner claimed a salary and wage deduction of $117,777,501 under

section 83 partly on the argument that the Chin stock was transferred to Chin in

2002 in connection with the performance of services and did not vest until

[*17] petitioner's TYE March 31, 2009.  Respondent challenged the deduction, arguing that the Chin stock was not transferred in connection with the performance of services under section 83 but rather was considered fully vested and outstanding capital stock of an S corporation immediately upon issuance in 2002.  Additionally, respondent argued that treatment of the Chin stock as fully vested and outstanding capital stock of DTRI is consistent with seven years of multiple representations of outstanding stock ownership made by DTRI, Hume, and Chin for Federal tax and other corporate purposes.  Therefore, the principal issue we must decide is whether section 83 applies to the Chin stock so as to entitle petitioner to the claimed deduction.

According to the general rule, petitioner bears the burden of proving, by a preponderance of the evidence, that respondent's determinations are incorrect.  See Rule 142(a);  Welch v. Helvering, 290 U.S. 111, 115 (1933).  Moreover, deductions are a matter of legislative grace, and petitioner bears the burden of proving entitlement to any claimed deductions.  See Rule 142(a)(1); INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992).  We conclude on the basis of the record that petitioner has failed to carry this burden.

Section 83(a) governs the tax treatment of property transferred "in connection with the performance of services" and generally provides that the value

[*18] of such property is taxable "in the first taxable year in which the rights of the person having the beneficial interest in such property are transferable or are not subject to a substantial risk of forfeiture". "The rights of a person in property are subject to a substantial risk of forfeiture if such person's rights to full enjoyment of such property are conditioned upon the future performance of substantial services by any individual." Sec. 83(c)(1). "The rights of a person in property are transferable only if the rights in such property of any transferee are not subject to a substantial risk of forfeiture." Sec. 83(c)(2). Accordingly, section 83(h) allows a deduction under section 162 to the person for whom such services were performed in an amount equal to the amount included under section 83(a) in the gross income of the person who performed such services. The statute permits a taxpayer to defer recognition of any gain until his rights in the restricted property become "substantially vested". Sec. 1.83-1(a)(1), Income Tax Regs.; see Strom v. United States, 641 F.3d 1051, 1056 (9th Cir. 2011).

Therefore, in order for section 83 to apply in the manner that petitioner asserts, petitioner must show that: (1) the Chin stock was transferred in connection with the performance of services and (2) the Chin stock was subject to a substantial risk of forfeiture until October 17, 2008. Petitioner believes the stipulated facts and exhibits establish that DTRI issued the Chin stock to compel

**[\*19]** his continued employment with DTRI, and had that employment terminated, Chin would have been required to sell the Chin stock back to DTRI at a below-market rate. However, for the reasons stated below, we conclude that petitioner failed to meet either requirement of section 83 and, therefore, section 83 does not apply in this case.

A.    Transferred in Connection With the Performance of Services

The determination of whether the Chin stock was transferred "in connection with the performance of services" is essentially a question of fact. Centel Commc'ns Co. v. Commissioner, 92 T.C. 612, 627 (1989) (citing Bagley v. Commissioner, 85 T.C. 663, 669 (1985), aff'd, 806 F.2d 169 (8th Cir. 1986)), aff'd, 920 F.2d 1335 (7th Cir. 1990). In order for section 83 to apply in this matter, it must be shown that the stock was transferred in connection with the performance of services by Chin. The following factors have been considered in such an analysis:

(1) whether the property right is granted at the time the employee or independent contractor signs his employment contract;

(2) whether the property restrictions are linked explicitly to the employee's or independent contractor's tenure with the employing company;

[*20] (3) whether the consideration furnished by the employee or independent contractor in exchange for the transferred property is services; and

(4) the employer's intent in transferring the property.

See Bagley v. Commissioner, 806 F.2d at 170-171; Alves v. Commissioner, 734 F.2d 478, 481-482 (9th Cir. 1984), aff'g 79 T.C. 864 (1982); Montelepre Systemed, Inc. v. Commissioner, T.C. Memo. 1991-46 (citing Centel Commc'ns Co. v. Commissioner, 92 T.C. 612), aff'd, 956 F.2d 496 (5th Cir. 1992).

Petitioner asserts that the Chin stock was transferred in connection with the performance of services because: (1) the Chin stock was granted when Chin began his employment at DTRI; (2) the Chin stock was restricted in a manner that linked the stock to Chin's continued performance of services; (3) Chin's services served as the consideration for the stock; and (4) DTRI intended to limit the transfer of stock exclusively to employees as compensation for services.

The first and second factors appear to be met. It is evident that the Chin stock was transferred near the time when DTRI entered into the shareholders agreement and the employment agreement with Chin. The consent authorizing the issuance of the shares is dated December 12, 2002. The stock certificates, shareholders agreement, and employment agreements are all dated December 18, 2002. In consideration of the second factor, petitioner points to the shareholders

[*21] agreement and argues that the Chin stock was restricted and conditioned on Chin's continued employment with DTRI. Petitioner also contends that if Chin's employment had ended, he would have been required to relinquish the shares of DTRI at a discounted price based on the duration of his employment at DTRI. It is evident that the shareholders agreement contains terms that protect against ownership by nonemployees of DTRI. However, the question of whether those terms provide a substantial risk of forfeiture in regard to the Chin stock remains, as discussed infra part B.

Whether petitioner has met the third factor is less evident. Petitioner argues that Chin's services served as the consideration furnished in exchange for the Chin stock. Petitioner believes that the $450 that Chin deposited into the bank account was a nominal amount that would correspond to the par value of the shares subsequently issued and was less than the intrinsic value of the services that he had devoted to the enterprise by that time. However, petitioner did not provide evidence to support this contention. Petitioner has failed to show that Chin's $450 deposit should not be considered an entrepreneurial investment, thereby representing the true consideration for the issuance of the Chin stock.

Whether petitioner has met the fourth factor is also less evident. Petitioner had no ownership interest in DTRI until October 2008 and was not a party to

[*22] either the shareholders agreement or the employment agreements upon which it relies to establish intent. Neither was petitioner a party to discussions between DTRI, Hume, and Chin in 2002 in connection with the organization of DTRI and the issuance of DTRI's capital stock. Therefore, petitioner cannot speak with certainty to DTRI's intent.

However, Hume and Chin were parties to both the shareholders agreement and the employment agreements. Both Hume and Chin participated in discussions regarding the issuance of DTRI's capital stock and had personal knowledge regarding the transfer of the Chin stock. Hume, as director of DTRI, executed the consent and participated in discussions regarding both the organization of DTRI and the issuance of DTRI's capital stock. From 2002 through 2008, DTRI, Hume, and Chin made representations that Chin had outright unrestricted ownership of the Chin stock.

From 2002 through 2006 DTRI also distributed income and losses to Chin as if he was the owner of the Chin stock as fully vested and outstanding stock. Chin, in turn, received his share of the profits of DTRI and reported those distributions on his individual income tax returns. DTRI, Hume, and Chin also consistently treated the Chin stock as outstanding stock of DTRI for corporate purposes as evidenced by the DTRI bylaws and other corporate documents.

[*23] Article 2 of DTRI's bylaws (Capital Stock) provides:

> The authorized number of shares, the classes, and the par value of stock of the corporation shall be established by the Articles of Incorporation and amendments thereto; that each outstanding share having voting rights shall be entitled to one vote on each matter submitted to a vote at the meeting of the shareholders; and that certificates representing shares of the corporation shall be issued to every shareholder for the fully paid shares owned by him in such form as the Board of Directors shall determine.

Additionally, Chin voted and signed corporate documents as an outstanding owner of class A stock in DTRI from 2002 through 2008.

In all other situations where DTRI transferred stock to employees in connection with the performance of services, the restrictive stock agreements specifically state that the stock grants were made "in consideration of the employment." The respective employment agreements also explicitly tie the stock grants to the performance of services. In contrast, neither the shareholders agreement nor Chin's employment agreement explicitly ties the granting of the Chin stock to the performance of services.

We acknowledge there are cases suggesting that a broad reading of the applicability of section 83 is appropriate. See, e.g., Alves v. Commissioner, 79 T.C. at 876 ("Congress * * * has clearly expressed the intention that section 83 is to have the broadest application"); Montelepre Systemed, Inc. v. Commissioner,

[*24] T.C. Memo. 1991-46, 1991 Tax Ct. Memo LEXIS 65, at *19 ("[T]he statute only envisions some sort of relationship between the services performed and the property transferred."). However, on the facts and circumstances of this case, we conclude that petitioner has failed to prove the Chin stock was transferred in connection with the performance of services pursuant to section 83. Nonetheless, in this matter we believe the crux of our section 83 analysis is whether the Chin stock was subject to a substantial risk of forfeiture.

B.   Substantial Risk of Forfeiture

Petitioner contends that the initial issuance of the Chin stock was subject to a substantial risk of forfeiture under section 83 and, therefore, deductible as compensation under section 162. Shares of stock are subject to a substantial risk of forfeiture when the owner's rights to their full enjoyment are conditioned upon the future performance of substantial services by any individual. See sec. 1.83-3(c)(1), Income Tax Regs.; see also Facq v. Commissioner, T.C. Memo. 2006-111. Whether a risk of forfeiture is substantial depends on the facts and circumstances. Sec. 1.83-3(c)(1), Income Tax Regs. Property is not transferred subject to a substantial risk of forfeiture if at the time of transfer the facts and circumstances demonstrate that the forfeiture condition is unlikely to be enforced. Id.

**[*25]** Section 1.83-3(c)(3), Income Tax Regs., governs enforcement of forfeiture provisions and provides five factors to consider "[i]n determining whether the possibility of forfeiture is substantial in the case of rights in property transferred to an employee of a corporation who owns a significant amount of the total combined voting power or value of all classes of stock of the employer corporation." Those factors are: (i) the employee's relationship to other stockholders and the extent of their control, potential control and possible loss of control of the corporation; (ii) the employee's position in the corporation and the extent to which he is subordinate to other employees; (iii) the employee's relationship to the officers and directors of the corporation; (iv) the person who must approve the employee's discharge; and (v) the employer's prior actions in enforcing the provisions of the restrictions. Id.

Petitioner contends that the first three factors leave little doubt that Chin did not have sufficient control over DTRI to modify, cancel, or waive the restrictions on the Chin stock. Petitioner argues that the Chin stock was subject to a substantial risk of forfeiture because the shareholders agreement contains provisions that: (1) could not be waived unilaterally by Chin; (2) require Chin to sell his stock back to DTRI at a price below fair market value if he terminated employment within 20 years of execution of the shareholders agreement; and (3)

[*26] preclude Chin from transferring or selling his stock without first offering it to DTRI. Petitioner contends that Chin was subordinate to Hume because Hume owned 50.25% of the voting shares and served as DTRI's president, CEO, and sole director. Petitioner argues that Chin's risk of forfeiture is governed by the first example in section 1.83-3(c)(3), Income Tax Regs., which establishes that if a majority of a corporation's voting stock "is owned by an unrelated individual * * * so that the possibility of the corporation enforcing a restriction on * * * [another shareholder's property] rights is substantial, then such rights are subject to a substantial risk of forfeiture."

Alternatively, respondent argues that the shareholders agreement does not contain substantial risk of forfeiture provisions for purposes of section 83. Respondent contends that the record contains no evidence that: (1) DTRI transferred class A common voting stock to any other employees in connection with the performance of services; (2) any class A common voting stock was subject to a substantial risk of forfeiture; and (3) any restrictions on class A stock were ever actually enforced. Respondent argues that the shareholders agreement provides an agreed-upon price for the repurchase by DTRI of the capital stock owned by Hume and Chin based upon a formula contingent upon years of service. Respondent further argues that because Chin was the executive vice president,

[*27] COO, and a 49.75% shareholder in voting stock of DTRI, it is unlikely Hume would have taken any actions to terminate Chin's employment. Finally, respondent states that petitioner failed to demonstrate the existence of any enforcement history by DTRI of restrictions in connection with class A common voting stock. Respondent contends that the stipulation of facts contains information regarding the enforcement of forfeiture provisions only with respect to employees owning small percentages of DTRI class B common nonvoting stock.

We believe that petitioner failed to show that the Chin stock was subject to a substantial risk of forfeiture. The facts and circumstances support this position. Hume and Chin had a very close work relationship. They were DTRI's initial investors, and together they built the company from its early stages of incorporation. Along with Hume, Chin voted on all company matters and helped determine the company's overall direction. Since Chin held such a vital role within DTRI as the executive vice president, COO, and a 49.75% shareholder in voting stock, it is unlikely that Hume would have taken any actions to terminate his employment.

Additionally, the parties stipulated the following:

If called to testify, Hume and Chin would testify that, during the period beginning in December 2002 until the merger of DTRI with petitioner in August 2008 ("the pre-merger period"), their ownership

[*28] interests in the Class A and Class B stock of DTRI subscribed to in December 2002, is consistent with representations made by DTRI, Hume and Chin of outstanding ownership in such stock on all Federal tax filings made by DTRI, Hume and Chin during the pre-merger period.

Petitioner argues that the stipulation regarding Hume's and Chin's testimony caused respondent to confuse legal ownership of outstanding shares with tax ownership under section 83. Petitioner contends that the dispute involves whether the legally owned shares were subject to restrictions that make clear they were issued in connection with the performance of services and subject to a substantial risk of forfeiture. Petitioner believes that the stipulation does not negate the manner in which Hume, Chin, and DTRI structured and documented their interactions. Petitioner submits that the DTRI documents are controlling and establish its entitlement to the section 83 deduction. However, respondent contends that the stipulation directly contradicts petitioner's interpretation of the agreements and the basis for the claimed deduction. We agree. In addition to Hume, Chin, and DTRI's representation and treatment of the Chin stock as outstanding stock, we believe that Hume's and Chin's statement establish that the intent of the parties in 2002 was to transfer the Chin stock as fully vested and outstanding stock in DTRI.

**[*29]** Chin's actions make it evident that the risk of forfeiture was not significant. Chin treated the Chin stock as if he had full ownership rights and control from the initial issuance in 2002. The Chin stock was issued subject to the shareholders agreement. From 2002 through 2006 Chin reported all allocations and distributions of profits and losses arising from his ownership of the Chin stock on his Federal income tax returns. In contrast, the subsequent issuances of class B common nonvoting stock were issued subject to restricted stock grants. These grants explicitly provide guidelines for the treatment of such stock both before and after vesting. Chin's restricted stock grant on the class B common nonvoting stock issued on December 31, 2007, specifies that

> [p]rior to vesting of the Granted Stock * * * you will have no rights as a shareholder of DTRI. All shares of Granted Stock that have not yet vested shall be held by DTRI in the form of non-certificated shares until they are fully vested or, in the event that your employment terminates prior to vesting, such Granted Stock shall be cancelled on the books of DTRI.

Petitioner failed to provide any evidence of the method of recourse intended to recover any nonvested Chin stock in the event that Chin violated the terms of the shareholders agreement. Moreover, petitioner failed to demonstrate that DTRI had ever enforced any restrictions in connection with class A common voting stock.

[*30] This Court has previously determined that "[t]he regulations make clear that an earnout restriction creates 'a substantial risk of forfeiture' if there is a sufficient likelihood that the restriction will actually be enforced." Austin v. Commissioner, 141 T.C. 551, 568 (2013) (quoting section 1.83-3(c)(4) and (3), Income Tax Regs.).  Petitioner has failed to show proof of the likelihood of enforcement of the forfeiture provisions on the Chin stock.  Therefore, we conclude that petitioner has failed to carry its burden of proof with respect to this issue.  Accordingly, we hold that the Chin stock was not subject to a substantial risk of forfeiture under section 83.  Consequently, petitioner is not entitled to a deduction, pursuant to section 83, for salary and wage compensation with regard to the Chin stock.

In reaching our holding herein, we have considered all arguments the parties made, and to the extent we did not mention them above, we conclude they are moot, irrelevant, or without merit.

To reflect the foregoing,

Decision will be entered for

respondent.